UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                    :          15 Cr. 73 (RMB)

EVGENY BURYAKOV,                            :
  a/k/a "Zhenya,"

                                            :

                        Defendant.
-------------------------------------------------------------x


## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S PRE-TRIAL MOTIONS


PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America


Adam Fee
Ian McGinley
Anna M. Skotko
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND ............................................................................... 2

    I.      THE COMPLAINT AND INDICTMENT ................................................ 2

    II.     BURYAKOV'S ENTRY INTO THE UNITED STATES AS AN EMPLOYEE OF THE NY BANK .......................................................................... 4

    III.    BURYAKOV'S PRETRIAL MOTIONS ............................................... 7

ARGUMENT ...................................................................................................... 7

    I.      THE DEFENDANT IS NOT ENTITLED TO DISMISSAL OF THE INDICTMENT BECAUSE HE OBTAINED A VISA TO WORK FOR THE NY BANK ............................................................................................. 7

        A.   Relevant Legal Principles .......................................................... 8

        B.   Discussion ................................................................................. 11

    II.     SECTION 951 IS NOT VOID FOR VAGUENESS AS APPLIED IN THIS CASE ...................................................................................... 19

        A.   Legal Standard ......................................................................... 19

        B.   Discussion ................................................................................. 20

    III.    BURYAKOV IS NOT ENTITLED TO A BILL OF PARTICULARS .............. 23

        A.   Additional Facts Relevant to the Defendant's Request for a Bill of Particulars............. 23

        B.   Applicable Law .......................................................................... 25

        C.   Discussion ................................................................................. 26

CONCLUSION ................................................................................................. 28

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pre-trial motions of defendant Evgeny Buryakov ("Buryakov" or "the defendant"). The defendant is alleged to have been a covert intelligence agent for the Russian Federation. From 2010 through his arrest in January 2015, Buryakov worked under the cover of his position as a banker at the Manhattan office of a partly state-owned Russian bank, Vnesheconombank ("VEB"). In this position, the defendant used his cover as a banker to form relationships with others in the financial industry, and to exploit those relationships in order to gather economic intelligence useful to his spymasters in Russia. Because he was operating under the cover of his position as a banker, Buryakov relied on his co-conspirators in New York City to transmit intelligence back to Moscow. Specifically, Buryakov worked with, among others, two Russian intelligence agents located in New York City, his co-defendants Viktor Podobnyy and Igor Sporyshev. Podobnyy and Sporyshev – unlike Buryakov – were operating as spies under the cover of their official positions with the Russian Federation; the two men therefore had access to secure facilities in the Russian Mission in New York, which they used to transmit intelligence prepared by Buryakov and others back to Moscow.

The defendant now asks the Court to dismiss the indictment, and seeks a bill of particulars. Put simply, the defendant argues that dismissal is required because he obtained a temporary worker visa to enter the United States to work for VEB's New York branch (the "NY Bank"). As set forth in more detail below, in light of the plain text of the relevant statutes and regulations, as well as Buryakov's and his employer's representations about the nature of his banking work in the United States, this is claim is meritless. Indeed, at no point before or during

his entry into the United States did Buryakov state or represent that he was here working on behalf of the government of the Russian Federation.

Buryakov's motions should be denied in their entirety.

## FACTUAL BACKGROUND

### I.       THE COMPLAINT AND INDICTMENT

In January 2015, Evgeny Buryakov was charged by complaint (the "Complaint" or "Compl.," attached as Exhibit A), and arrested. Buryakov was later charged in a two-count indictment ("Indictment" or "Ind.") – along with two co-defendants, Igor Sporyshev and Viktor Podobnyy – with (i) conspiring to act as an unregistered agent of a foreign government, namely, the Russian Federation, in violation of Title 18, United States Code, Sections 371 and 951 (Count One); and (ii) acting as an unregistered agent of the Russian Federation, in violation of Title 18, United States Code, Sections 951 and 2 (Count Two).

Buryakov's criminal conduct is detailed at length in the Complaint. Based on the allegations in the Complaint and the Indictment, Buryakov is alleged to have engaged in the following:

Beginning in or about 2012 and continuing through his arrest in January 2015, Buryakov worked in the United States as an agent of Russia's foreign intelligence agency, known as the "SVR."  Buryakov operated under "non-official cover," meaning he entered and remained in the United States as a private citizen, posing as an employee in the Manhattan office of Vnesheconombank (the "NY Bank").[1]  SVR agents operating under such non-official cover – sometimes referred to as "NOCs" – typically are subject to less scrutiny by the host government,

---

[1] In this memorandum, "VEB" refers to the Russia-based parent corporation of Vnesheconombank; the "NY Bank" refers specifically to the New York branch office of VEB.

and, in many cases, are never identified as intelligence agents by the host government.  As a result, a NOC is an extremely valuable intelligence asset for the SVR.

Buryakov's co-defendants, Igor Sporyshev and Victor Podobnyy, are also SVR agents who worked in the United States to gather intelligence on behalf of Russia by posing as official representatives of Russia.   During the course of the charged offenses, Sporyshev was responsible for relaying assignments from the SVR to Buryakov, and Sporyshev and Podobnyy were responsible for analyzing and reporting back to the SVR about the fruits of Buryakov's intelligence-gathering efforts.  The directives from the SVR to Buryakov, Sporyshev, and Podobnyy, as well as to other covert SVR agents acting within the United States, included requests to gather intelligence on, among other subjects, potential United States sanctions against Russian banks and the United States' efforts to develop alternative energy resources.  As part of their duties for the SVR, Sporyshev and Podobnyy also attempted to recruit New York City residents as intelligence sources for Russia.

Buryakov's work as a spy was entirely distinct from his cover job at the NY Bank.  As the Complaint and discovery make clear, Buryakov reported sensitive intelligence he had gathered from unwitting sources back to his fellow spies and *not* to his colleagues and superiors at the NY Bank. *See* Compl. ¶¶ 49-53. And at no point did Buryakov publicly state or represent that he was working for the government of the Russian Federation, as opposed to the NY Bank, over the course of his approximately five years in the United States.

The evidence of Buryakov's conduct was derived from multiple sources over the course of the investigation, consisting of recorded conversations involving the three co-defendants, including direct communications between Buryakov and Sporyshev; physical surveillance of

Buryakov and others; Buryakov's interactions with an FBI confidential source; and searches of Buryakov's residence and office.

## II.   BURYAKOV'S ENTRY INTO THE UNITED STATES AS AN EMPLOYEE OF THE NY BANK

The defining aspect of Buryakov's work as an SVR agent was his cover position with the NY Bank. As reflected in the Complaint, the Indictment, and the discovery,  Buryakov used the access and opportunities available to him as an employee of the NY Bank to gather economic intelligence for himself and other SVR agents while acting at the direction of the Russian Federation. Among other examples, while acting undercover as a banker, Buryakov transferred from one office of VEB located outside Russia to the NY Bank under the guise of an "intracompany" transfer, *see id*. ¶¶ 50-53; traveled to business conferences outside the United States, *see id.*. ¶ 56; and procured meetings with employees of various financial institutions based in New York City, *see id.* ¶¶ 66-74.

And to be clear, Buryakov's entry into the United States was made exclusively under the guise of this central deception – that Buryakov was simply an employee of the NY Bank, and not a trained intelligence agent – or even an official representative – of the Russian Federation. At no point during Buryakov's attempts to obtain United States work visas did Buryakov or his employer, the NY Bank, state or represent that he was working for the government of the Russian Federation, as opposed to the NY Bank.

Specifically, Buryakov obtained authorization to enter the United States as a banker by taking the following steps:

- In May 2010, the head of the NY Bank filed a petition (the "2010 Petition") requesting authorization for Buryakov to apply for a work visa. *See* Def. Ex. C, at 2.

- The 2010 Petition was completed using U.S. Citizenship and Immigration Services ("CIS") form I-129, which is labeled a "Petition for a Nonimmigrant worker." *Id.* at 7-12.

- The 2010 Petition listed "the employer" as "The Bank for Development and Foreign Economic Affairs (Vnesheconombank)," and the employer's address as the NY Bank's office in Manhattan. *Id.* at 7.

- The 2010 Petition listed Buryakov as the "person(s) you are filing for," with the "Job Title" of "Deputy Representative." *Id.* at 8-9. It identified the NY Bank's "Type of Business" as "International Banking and Finance," and stated that the NY Bank was "Established" in 1924 and had a "Gross Annual Income" of "$510 million." *Id.* at 10. The 2010 Petition was signed by the head of the NY Bank and an attorney for the NY Bank. *Id.*

- At or around the time of the filing of the 2010 Petition, the NY Bank also filed a "Supplement," which indicated that it sought authorization for Buryakov to apply for an "L-1A manager or executive" visa. *Id.* at 11.

- The Supplement enclosed an April 30, 2010 letter from the head of the NY Bank to CIS, which outlined Buryakov's qualifications and his anticipated duties at the NY Bank. The letter stated:

    > [Buryakov] currently serves as the Deputy Head for the Representative Offices Division of the Bank for Development and Foreign Economic Affairs in Russia (Vnesheconombank Russia). Mr. Buryakov has over seven years of experience as a foreign banking expert within the international Vnesheconombank group with the last five years spent in operational management roles in South Africa and Russia.

    *Id.* at 13.

- The letter also summarized VEB's origins and its "role [] as an agent of the Russian government in international trade and economic development." *Id.* at 13. With respect to the NY Bank, the letter stated that "Vnesheconombank New York is the New York Representative Office of Vnesheconombank Russia and has been operating in the United States since 1989 as a branch office of the bank." *Id.* at 14.

- In July 2010, CIS approved the petition. The approval notice stated that "the approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status." *Id.* at 16.

- In May 2013, the head of the NY Bank filed a second petition (the "2013 Petition"), using CIS form I-129, which sought authorization for Buryakov to apply for an extension of the L-1A visa. *Id.* at 21-22.

- Similar to the 2010 Petition, the 2013 Petition listed the "Petitioner" as the NY Bank; the "Beneficiary" as Buryakov; Buryakov's "Title" as "Deputy Representative" at the NY Bank's office in Manhattan; the "Type of Business" as "International Banking and Finance"; and largely identical information about VEB and the NY Bank. *Id.* at 25-41.

- CIS approved the 2013 Petition in May 2013. *Id.* at 21-22.

- After the approval of the 2010 Petition, in or about late July 2010, Buryakov applied for an L-1A visa through CIS's online application system (the "2010 Application"). *See* Govt. Ex. B at 1.

- The 2010 Application identified the "Purpose" of Buryakov's trip to the United States as an "Intracompany Transfer (L)"; Buryakov's "Primary Occupation" as "Business"; the "US Contact" as the head of the NY Bank; and the "Name of Employer" as "Vnesheconombank Representative Office in New York." *Id.* at 1-3.

- Buryakov was granted an L-1A visa shortly after filing the 2010 Application, and used it to enter the United States and begin working for the NY Bank.

- Buryakov submitted nearly identical applications to extend his L-1A visa in July 2012 (the "2012 Application") and May 2013 (the "2013 Application"), both of which were granted. *See* Govt. Exs. C (2012 Application); and D (2013 Application).[2]

Notably, on all three of the visa applications, Buryakov was also required to answer the question:

> Do you seek to engage in espionage, sabotage, export control violations, or any other illegal activity while in the United States?

*See* Govt. Ex. B at 3; Ex. C at 4; Ex. D at 4. Buryakov responded "NO" each time, and each document bears his electronic signature. Notably, Buryakov falsely answered "NO" to the question of whether he sought to engage in "espionage" or "any other illegal activity" only after confirming that his statements in the applications were "made under penalty of perjury," pursuant to 28 U.S.C. § 1746.

---

[2] In the body of this memorandum, the 2010 and 2013 Petitions, and Buryakov's 2010, 2012, and 2013 Applications are referred to collectively as the "Visa Documents."

III.     **BURYAKOV'S PRETRIAL MOTIONS**

Buryakov argues for dismissal on two principal bases: (i) the purported failure to state a criminal offense in the Indictment due to Buryakov's exemption from criminal liability under Section 951 because he obtained a visa to work for the NY Bank; and (ii) a due process challenge, focusing on the purported lack of "fair notice" and unconstitutional vagueness arising from Buryakov's prosecution under Section 951. Buryakov also seeks a bill of particulars.

## ARGUMENT

I.     **THE DEFENDANT IS NOT ENTITLED TO DISMISSAL OF THE INDICTMENT BECAUSE HE OBTAINED A VISA TO WORK FOR THE NY BANK**

Buryakov claims that the Indictment should be dismissed because he is immune from prosecution under 18 U.S.C. § 951 (hereinafter, "Section 951"). Specifically, according to Buryakov, he could engage in espionage on behalf of the Russian Federation without notifying the Attorney General because he entered the United States on a temporary worker visa to work as a banker for the NY Bank. Buryakov argues that this fact alone rendered him an "officially and publicly acknowledged and sponsored official or representative of a foreign government." 18 U.S.C. § 951(d)(2).

As discussed below, Buryakov's argument mischaracterizes the plain language and meaning of the relevant provision in Section 951(d)(2). The fact that Buryakov obtained a work visa to enter the United States as an "international banker" employed by the NY Bank by lying to the United States on his visa applications about his intention not to engage in espionage neither conferred upon Buryakov some official status or immunity nor shielded him from liability under Section 951. Accordingly, the Court should reject this argument.

A.       Relevant Legal Principles

The predecessor to Section 951 was originally enacted in 1917 as part of a series of changes to the country's national security laws after World War I. *See United States* v. *Duran*, 596 F.3d 1283, 1293-94 & n.4 (11th Cir. 2010) ("Legislative history suggests that the 1917 Act was a war-time act to protect the United States from subversive elements that could threaten America's war effort.") (citing H.R. Rep. No. 65–30, at 1 (1917), H.R. Rep. No. 65–65, at 1 (1917) (Conf. Rep.); H.R. Rep. No. 65–69, at 1 (1917) (Conf. Rep.)). To violate Section 951, (1) a person must act; (2) the action must be taken at the direction of or under the control of a foreign government; and (3) the person must fail to notify the Attorney General before taking such action. *See* 18 U.S.C. § 951(a) (criminalizing "acts" of "an agent of a foreign government without prior notification to the Attorney General"); 18 U.S.C. § 951(d) (defining "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official"); 28 C.F.R. § 73.1(a) (defining "agent" as "all individuals acting as representatives of, or on behalf of, a foreign government or official, who are subject to the direction and control of that foreign government or official"); 28 C.F.R. § 73.3 (detailing the procedure and means of giving notification to the Attorney General).

Section 951(d) excludes from the statute's registration requirements three groups of individuals who are already firmly associated with and acting on behalf of a foreign government: (i) diplomatic and consular officials (Section 951(d)(1)); (ii) sponsored officials or representatives of a "foreign government" who are "officially and publicly acknowledged" (Section 951(d)(2)) (hereinafter, referred to as the "Sponsored Official Exemption"); and (iii) the staff and employees of individuals in the first two groups (Section 951(d)(3)). In the instant

motion, Buryakov argues that he is subject to the Sponsored Official Exemption because he obtained a work visa for his job at the NY Bank.

Courts that have addressed claims under Section 951 have relied upon the statute's corresponding regulations for guidance on its application. *See* 28 C.F.R. § 73.1 *et seq*. ("Section 951's corresponding regulations set forth further guidance on compliance with the statute. *See* 28 C.F.R. § 73.1 et seq."). Of relevance here, 28 C.F.R. § 73.1(e) defines the term "officially and publicly acknowledged and sponsored" as used in the Sponsored Official Exemption. As set forth below, section 73.1 provides four examples of what the phrase "officially and publicly acknowledged and sponsored" means:

1. The person described therein has filed with the Secretary of State a fully-executed notification of status with a foreign government;

2. Or is a visitor, officially sponsored by a foreign government, whose status is known and whose visit is authorized by an agency of the United States Government;

3. Or is an official of a foreign government on a temporary visit to the United States, for the purpose of conducting official business internal to the affairs of that foreign government;

4. Or where an agent of a foreign government is acting pursuant to the requirements of a Treaty, Executive Agreement, Memorandum of Understanding, or other understanding to which the United States or an agency of the United States is a party and which instrument specifically establishes another mechanism for notification of visits by agents and the terms of such visits.

28 C.F.R. § 73.1(e).   As this regulation reflects, the Sponsored Official Exemption is intended to cover visiting officials of foreign governments, who are "officially sponsored by a foreign government" or actually conducting "official business internal to the affairs of that foreign government." In addition, for the purposes of Section 951(d)(2), the phrase "foreign government" is defined in 18 U.S.C. § 11 (titled "Foreign government defined"), which provides:

> The term "foreign government" . . . includes any government, faction, or body of insurgents within a country with which the United States is at peace, irrespective of recognition by the United States.

Thus, based on these authorities, the exceptions to Section 951's registration requirements in Section 951 may be described as follows:

- Section 951(d)(1): duly accredited diplomats and consular officers of a foreign government, such as an ambassador or trade representative;

- Section 951(d)(2) (the Sponsored Official Exemption): visiting officials or representatives of a foreign government, who are officially and publicly acknowledged and sponsored, such as a visiting elected official or government minister temporarily traveling to the United States on official business;

- Section 951(d)(3): staff or employees of those individuals within categories (1) and (2); and

- Section 951(d)(4): persons engaged in lawful commercial transactions with a foreign government, such as an attorney or other individual retained to provide a lawful service in the United States.

Therefore, no portion of Section 951, its exemptions, or the related regulations refer to an exemption for employees of partly state-funded businesses who gain admission to the United States based on a standard CIS "Petition for a Nonimmigrant Worker" form.[3] To the contrary, the Sponsored Official Exemption, as well as the other three exemptions in Section 951, expressly require, among other things, that the exempted individual must be officially sponsored by, or in fact be an official of, a "foreign government."

---

[3] As the documents supplied by Buryakov with his motion make clear, including the Russian law that established VEB, VEB's assets are drawn from the reorganization of its predecessor institution, "asset contributions of the Russian Federation," income from VEB's "activities," "voluntary" asset contributions and donations, as well as "other lawful sources." Def. Ex. B at 5. As such, VEB is only partially funded by the Russian Federation.

B.      **Discussion**

      1.   **Buryakov Does Not Qualify for the Sponsored Official Exemption In Section 951**

Buryakov's argument that his petition for a temporary worker visa effectively rendered him an "officially and publicly acknowledged . . . official or representative of a foreign government" is not supported by the statements made by Buryakov and his employer, the NY Bank, in the Visa Documents or the text of the Sponsored Official Exemption in Section 951(d)(2). Def. Mem. at 13. Buryakov did not work in the United States as a publicly acknowledged representative of a "foreign government," as required by the Sponsored Official Exemption. As the definition set forth in 18 U.S.C. § 11 makes clear, the term "foreign government," as used in Section 951(d)(2), does not encompass the NY Bank – the U.S.-based branch of a partly state-funded banking corporation. Rather, a "foreign government" for the purposes of the Sponsored Official Exemption is plainly defined as "any *government* . . . within a country." 18 U.S.C. § 11 (emphasis added).

And to be clear, while spying for Russia in Manhattan, Buryakov was, at least publicly, working exclusively as an employee of the NY Bank, and not the Russian Federation. Buryakov and his employer, the NY Bank, affirmed and reaffirmed this assertion in his Visa Documents over and over again – every entry in the Visa Documents that related to Buryakov's "employer" listed the NY Bank, the head of the NY Bank, and the NY Bank's office in Manhattan. Indeed, throughout Buryakov's time in the United States, neither Buryakov nor his employer ever stated – in the Visa Documents or elsewhere – that he was working in the United States for the government of the Russian Federation, as opposed to the NY Bank.

Specifically, in the 2010 and 2013 Petitions, the "employer" was identified as "The Bank for Development and Foreign Economic Affairs (Vnesheconombank)," located at its office in

Manhattan. *See* Def. Ex. C at 7 (2010 Petition), 25 (2013 Petition). Similarly, Buryakov's 2010, 2012, and 2013 Applications do not indicate, or even suggest, that Buryakov was an official representative of the government of the Russian Federation. To the contrary, on each application, Buryakov stated that his "employer" was the NY Bank, and that the purpose of his move to the United States was an "intracompany transfer" from VEB's office in South Africa to its office in Manhattan. *See* Govt. Exs. B at 3; C at 3; D at 3.

Put simply, none of the statements on the Visa Documents support Buryakov's claim that, while working at the NY Bank, he was an official, publicly acknowledged representative of a "foreign government" – *i.e.*, the government of the Russian Federation. Buryakov was "officially and publicly acknowledged" as the representative of no entity other than the NY Bank.

In addition, the substance of the CIS forms included in the Visa Documents also make absolutely clear that, even assuming *arguendo* that Buryakov was an official representative of the Russian Federation, the Visa Documents could not have been the appropriate avenue to notify the United States government of his status.  The I-129 form used for the 2010 Petition outlined the purpose of the visa for which Buryakov was seeking to apply:

> L-1A visa status is a temporary nonimmigrant status, given for a specific, limited period of time, authorizing a U.S. company or foreign company doing business in the U.S. to petition for a foreign national who has been employed abroad by a parent, branch, affiliate or subsidiary in a managerial or executive capacity.

Def. Ex. C at 5. The I-129 form further stated that approval of the visa petition simply could not have any legal effect other than to permit Buryakov to apply for a work visa. The form expressly disclaimed any broader impact:

> The filing of an application or petition does not in itself allow a person to enter the United States *and does not confer any other right or benefit. . . Approval of an immigrant petition does not convey any right or status*. The approved petition simply establishes a basis upon which the person . . . can apply for an immigrant [] visa.

Def. Ex. C at 3 (emphasis added). These provisions reflect that the Visa Documents simply could not have served as the appropriate vehicle for Buryakov to ensure that United States authorities were alerted to his presence in the United States as an official representative of the Russian Federation, or for that notice to confer upon Buryakov protection from prosecution under Section 951.

Indeed, Regulation 73.1 lists some of the appropriate avenues by which the Russian Federation could have "officially and publicly acknowledged and sponsored" Buryakov as its representative in the United States.  These proper avenues include, for example, a fully-executed "notification of status" filed with the Secretary of State.  28 C.F.R. § 73.1.

Buryakov's motion is premised entirely on the argument that the Visa Documents somehow resulted in him being publicly acknowledged as an official representative of the Russian Federation itself, rather than the NY Bank. In light of the content of the Visa Documents, including the extensive statements of the NY Bank and Buryakov on those documents claiming that he was an employee of the NY Bank, this argument should be rejected.

### 2. The NY Bank's Relationship With the Russian Federation Did Not Render Buryakov an Official Representative of a Foreign Government

Buryakov argues that, because he worked for the NY Bank, whose corporate parent (VEB) is partly funded by the Russian Federation, he qualified as an official representative of the Russian Federation in the United States for purposes of Section 951(d)(2). *See, e.g.,* Def. Mem. at 10-11. But the fact that VEB appears to be at least partly funded by the Russian Federation,

13

and claims to conduct banking activities on behalf of the Russian Federation, *see* Def. Mem. at 14, does not make every employee of the NY Bank an official representative of the Russian Federation.

It is undisputed in this case that the NY Bank is a corporate entity separate and apart from the Russian Federation. As the Supreme Court has observed, under United States law, "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat. City Bank* v. *Banco Para El Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611, 626-27 (1983)[4]; *see EM Ltd.* v. *Republic of Argentina*, 473 F.3d 463, 479 (2d Cir. 2007) (observing "the presumption of separateness required by *Bancec*" between Argentina and its central bank operating in the United States under FSIA, at least where the bank's "separate juridical status" was undisputed); *see also N. Mariana Islands* v. *Millard*, 287 F.R.D. 204, 214 n.69 (S.D.N.Y. 2012) (Kaplan, J.) (same).

Throughout the course of his work as a spy, Buryakov used and relied upon the separate and distinct existence of the NY Bank from the Russian Federation to his advantage. In his Visa Documents, Buryakov and the NY Bank presented Buryakov as a "temporary worker" transferring from one branch of VEB to another, in order to perform bank management duties in New York. And on the visa Buryakov actually obtained to enter the United States in 2012, he was listed as an "intracompany transferee." *See* Govt. Ex. E.

---

[4] While the Supreme Court in *Bancec* ultimately held that the foreign development bank of Cuba was subject to liability under the Foreign Sovereign Immunities Act ("FSIA") notwithstanding its "separate juridical status," it did so in order "to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law." *First Nat. City Bank* v. *Banco Para El Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611, 633-34 (1983). That rationale obviously would not apply in this case, where maintaining the presumption of the NY Bank's separate juridical status is unchallenged, *see infra*, and would not work an "injustice" by shielding a foreign state from liability in a U.S. court.

In addition, as detailed in the Complaint, Buryakov relied on his work for the NY Bank to gain access to other bankers and companies in the United States and abroad – access that would likely have been curtailed had he identified himself as an official representative of the Russian Federation looking to find, take, and use economic intelligence.

And to be clear, it is a wholly unexceptional and widely accepted fact that the NY Bank and the Russian Federation possess entirely separate and distinct legal and corporate identities.[5] Indeed, in prior proceedings in this case, Buryakov has argued that the NY Bank and the Russian Federation are separate entities, and that working for the NY Bank does not render someone an agent, arm or representative of the Russian Federation.  In a May 14, 2015 letter to the Court, Buryakov, speaking through his counsel, stated:

> VEB is a free-standing company under Russian law. It is not an arm or agency of the Russian government, but has a separate and independent corporate existence that is well-recognized under U.S. law.

Govt. Ex. F (Buryakov's May 14, 2015 Letter at 2) (citations of *Bancec* and *EM Ltd.* omitted).[6]

Buryakov also argued that his counsel's contract with the NY Bank, in the form of a retainer agreement, did not create a legal relationship between his counsel and the Russian Federation but only with the NY Bank itself. As Buryakov's counsel stated, notwithstanding the

---

[5] The documents supplied by Buryakov further support the legal divide between VEB (including its New York branch, the NY Bank) and the Russian Federation. Among other things, the law establishing VEB provides that (i) VEB's assets shall be drawn from both public and private sources, including its own activities; and (ii) VEB "shall not be held liable for the obligations of the Russian Federation," and the "Russian Federation shall not be held liable for the obligations of [VEB]." Def. Ex. B at 5. That law further provides that "the governmental bodies of the Russian Federation … and local self-government bodies are not entitled to interfere in [VEB's] activity." *Id.*

[6] In his memorandum submitted in support of the instant motion, Buryakov continues to maintain that VEB is a "separate legal entity from the Russian Federation." Def. Mem. at 15.

fact that his counsel executed a contract with the NY Bank, "[Buryakov's counsel] has no agreement with the Russian State."[7] *Id.*

### 3. The Legislative History of Section 951 Weighs In Favor of Denying Buryakov's Motion

Buryakov argues that the history of Section 951 and its amendments support his view that he is immune from liability under the statute because he worked for the NY Bank. But the history and plain meaning of Section 951 supports the opposite conclusion. Specifically, Buryakov points to a statement made in advance of the passage of the 1984 bill implementing the exemptions in Section 951(d)(2), in which a State Department attorney appeared to discuss exempting individuals in the United States "on business on behalf of foreign governments," or "engaged in legitimate representation of foreign governments." Def. Mem. at 18. The comments appear to offer, in substance, a roughly accurate summary of one of the exemptions – Section 951(d)(4) exempts from the registration requirements individuals engaged in a legal commercial transaction with a foreign government.

These straightforward remarks, on their own, however, do not support the conclusion urged by Buryakov – specifically, that each and every employee of a corporation partially owned

---

[7]  Buryakov argues by analogy that the phrase "foreign official" is defined in the Foreign Corrupt Practices Act ("FCPA") to include "any officer or employee of a foreign government or any department, agency, or instrumentality," and that this fact somehow weighs in favor of his exemption from Section 951's registration requirements. *See* Def. Mem. at 14. Of course, the FCPA does not control the outcome in this case, and the defendant cites no authority to support the application of any of the definitions contained in the FCPA in the context of a Section 951 offense. However, while the detailed analysis required under the FCPA has little, if any, relevance here, it is beyond dispute that the definition of a "foreign official" in the FCPA describes a group of people much broader than the group covered by the Sponsored Official exemption in Section 951. *Compare* 15 U.S.C. § 78dd-1(f)(1)(A) ("'foreign official' [under the FCPA] means *any* officer or employee of a foreign government") (emphasis added) with 18 U.S.C. 951(d)(2) (the Sponsored Official Exemption applies to "any officially and publicly acknowledged and sponsored official or representative of a foreign government").  And that more circumscribed definition (in Section 951) makes sense in light of the purpose of Section 951, which is to prosecute only those individuals working as agents of a foreign government who fail to provide prior notification to the Attorney General.

or funded by a foreign government is exempt from prosecution under Section 951, irrespective of whether official, prior notification has been provided to the Attorney General. As discussed above, the plain text of the Sponsored Official Exemption and the related regulations clearly reflect that Buryakov is not exempt from Section 951's registration requirements, especially in light of the NY Bank's and Buryakov's repeated statements about the nature of his work for the NY Bank here in the United States.

But going beyond the plain language of the statute and regulations, it is important to note that, if the Court were to adopt the reading of the Sponsored Official Exemption urged by Buryakov, it may result in incongruous and potentially dangerous consequences. At its core, Buryakov's argument is that any employee of any state-sponsored or funded corporation – such as the NY Bank – would be free from any registration requirement or prosecution under Section 951 so long as the employee obtained a work visa before entering the United States  This view would exempt from prosecution under Section 951 any employee of, for example, state-funded media organizations, airlines, and energy companies who were working in the United States. Such employees – including everyone from, for example, an airplane mechanic employed at a state-funded airline at a United States airport to a banker at a state-owned foreign development bank in Manhattan– would be free to take orders from and act on behalf of a foreign government and its military and intelligence agencies, without notifying the United States. This scenario would run counter to the clear purpose of Section 951 – to ensure that the United States government is aware of those acting within its borders on behalf of "foreign governments."

Contrary to Buryakov's strained reading of the statute, it is far more reasonable to conclude that, consistent with the plain language of the exemption and related regulations, Congress did not intend to use the Sponsored Official Exemption to create a massive loophole in

17

Section 951 for each and every employee of any entity partly owned or funded by a foreign

government.[8]

**4.   Buryakov's Argument that the Indictment Must Allege the Non-Application of Each Section 951 Exemption Is Incorrect**

Buryakov further claims that, because the Indictment does not include an allegation that

specifically refutes the application of the Sponsored Official exemption, the Indictment must be

dismissed. Buryakov cites a single treatise in support of this argument, *see* Def. Mem. at 5-6,

which is directly contradicted by controlling Supreme Court and Second Circuit precedents.

The Supreme Court has affirmed the "settled rule" that an indictment need not include

allegations negating each "exception" or "affirmative defense" in a criminal statute. *See, e.g.,*

*Dixon* v. *United States*, 548 U.S. 1, 2 (2006); *McKelvey* v. *United States*, 260 U.S. 353 (1922)

("[A]n indictment or other pleading . . . need not negative the matter of an exception . . . [I]t is

incumbent on one who relies on such an exception to set it up and establish it."). This is also the

rule in the Second Circuit. *See, e.g.*, *United States* v. *Messina*, 481 F.2d 878, 880 (2d Cir. 1973)

(citing *McKelvey*). The Indictment plainly alleges facts to prove the elements of both charged

offenses – namely, a conspiracy and an attempt to violate Section 951, which provides criminal

liability for "[w]hoever . . . acts in the United States as an agent of a foreign government without

---

[8] Buryakov also argues that, to the extent the Sponsored Official Exemption is ambiguous in its application to Buryakov – which it is not – that ambiguity should be resolved in his favor due to the rule of lenity. *See* Def. Mem. at 14. The rule of lenity is applicable in very limited circumstances and only where "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute." *Barber* v. *Thomas*, 560 U.S. 474, 488 (2010) (internal quotation marks omitted); *see also United States* v. *Edelman*, 726 F.3d 305, 309-10 (2d Cir. 2013). Emphasizing its narrow application, the Second Circuit has cautioned that "the rule of lenity is not a catch-all maxim that resolves all disputes in the defendant's favor – a sort of juristical 'tie goes to the runner.'" *United States* v. *Gonzalez*, 407 F.3d 118, 124 (2d Cir. 2005). Where, as here, there is plainly the absence of an unresolved, grievous ambiguity, the rule of lenity has no application.

prior notification to the Attorney General[.]" *United States* v. *Dumeisi*, 424 F.3d 566, 581 (7th Cir. 2005). Nothing more is required.

## II.      SECTION 951 IS NOT VOID FOR VAGUENESS AS APPLIED IN THIS CASE

Buryakov argues that Section 951 is void for vagueness as applied in this case. Specifically, Buryakov argues both that (i) he did not have notice, and could not have had notice, of his obligation to notify the Attorney General that he was spying at the direction of the SVR while ostensibly working under the cover of his banking job at the NY Bank; and (ii) the prosecution of Buryakov under Section 951 would be arbitrary and sow confusion for others potentially falling within the statute. Def. Mem. at 15-24. Both arguments fail, as Buryakov has failed to identify any potential vagueness in the statute.

### A.      Legal Standard

Under the void-for-vagueness doctrine, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender* v. *Lawson*, 461 U.S. 352, 357 (1983). To meet that standard, a law need only "provide explicit standards" and "need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Mannix* v. *Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (internal quotation marks omitted). To determine whether a statute provides the requisite "fair notice," this Court examines "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States* v. *Rosen*, 716 F.3d 691, 699 (2d Cir. 2013).

Where, as here, there is no claimed violation of the First Amendment, a vagueness challenge is evaluated "only as applied to the facts of the particular case." *Mannix*, 619 F.3d at

197. If a defendant's conduct was "clearly proscribed" by the statute, he "cannot complain of the vagueness of the law as applied to the conduct of others." *Id*. at 197 (internal quotation marks omitted).

**B.     Discussion**

Buryakov cannot demonstrate that Section 951 is vague as applied to him. Section 951 and related statutes and regulations outline in detail the conduct sought to be prescribed.[9] *See* 18 U.S.C. § 951(a) (criminalizing "acts" of "an agent of a foreign government without prior notification to the Attorney General"); 18 U.S.C. § 951(d) (defining "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official"); 18 U.S.C. § 11 (defining the term "foreign government" to mean "any government . . . within a country with which the United States is at peace"); 28 C.F.R. § 73.1(a) (defining "agent" as "all individuals acting as representatives of, or on behalf of, a foreign government or official, who are subject to the direction and control of that foreign government or official"); 28 C.F.R. § 73.3 (detailing the procedure and means of giving notification to the Attorney General). "[Section] 951 plainly and concretely identifies the conduct which constitutes its violation, and the statute's language is clear and unambiguous." *Duran*, 596 F.3d at 1291 (citing *United States* v. *Latchin*, 554 F.3d 709, 715 (7th Cir. 2009) (finding that "[i]t was enough for the jury to conclude that Latchin took acts of some kind on behalf of Iraq without first registering as a foreign agent" (emphasis in original)); *United States* v. *Truong Dinh Hung*, 629 F.2d 908, 920 (4th Cir. 1980) (finding the term "agent" to be clear on the face of the statute); and *United States* v. *Lindauer*, No. S2 03 Cr.

_____

[9] It is well-settled, and the defendant does not dispute here, that knowledge or probability of knowledge of the registration requirement itself is not an element under Section 951. *See United States* v. *Duran*, 596 F.3d 1283, 1292 (11th Cir. 2010); *United States* v. *Latchin*, 554 F.3d 709, 715 (7th Cir. 2009).

807(MBM), 2004 WL 2813168, at *4 (S.D.N.Y. Dec. 6, 2004) (same)). "Therefore, the plain

language of § 951 and its corresponding regulations give notice of what is prohibited and are

readily understandable to a person of ordinary intelligence." *Duran*, 596 F.3d at 1291.

In this case, the conduct charged in the Indictment is "clearly proscribed by the statute."

*Lindauer*, 2004 WL 2813168, at *4. The Indictment alleges that Buryakov knowingly acted in

the United States as an agent of the Russian Federation, and specifically at the direction of

foreign officials in the United States who were Russian intelligence agents, and that he conspired

to do the same.  Ind. ¶¶ 5-8. The Indictment and the underlying Complaint outline in detail the

actions Buryakov took on behalf of the Russian Federation, all while ostensibly working as a

banker in New York for the NY Bank.

Whether characterized as a purported lack of "fair notice" or "vagueness," Buryakov's

argument is premised on his claim that, by obtaining a work visa for the NY Bank, he was

somehow a publicly acknowledged, official representative of the Russian Federation, and

therefore shielded from prosecution pursuant to the Sponsored Official Exemption. Buryakov

asserts that to reach a contrary conclusion under Section 951 would render the statute

unconstitutionally vague and deprive him of fair notice. But Buryakov never actually articulates

any argument for why this would be so. Nor could he.

The term "agent of a foreign government" is statutorily defined with exceptional

precision, 18 U.S.C. §§ 951(d) and 11, and there is nothing vague about the verb "to act." *See*

*Duran*, 596 F.3d at 1291. Nor is there anything unconstitutionally vague about the language of

the Sponsored Official Exemption – the phrase "officially and publicly acknowledged and

sponsored official and representative of a foreign government" is more than sufficiently clear, as

discussed *supra*.

As the substance of Buryakov's arguments make clear, his complaint is not that there is a lack of clarity as to what conduct is covered by the statute, but, rather, that the statute is overbroad because it criminalizes precisely what Buryakov did in this case. That does not render vague a statute that is otherwise "reasonably clear" as to the conduct it proscribes. *Rosen*, 716 F.3d at 699.

Any claim of inadequate notice is particularly misplaced here. As charged in the Indictment, Buryakov was acting as a covert Russian spy embedded at a bank in Manhattan – a bank that, by Buryakov's own account, "is not an arm or agency of the Russian government, but has a separate and independent corporate existence that is well-recognized under U.S. law." Def. May 14 Letter, at 2. Throughout the period of the charged offenses, Buryakov was reporting on his intelligence-gathering activities not to his superiors in the NY Bank, but to a team of Russian spies operating in the United States under the cover of their consular posts. *See* Compl. ¶¶ 12-13, 54-65. Buryakov regularly passed the intelligence he gathered to other spies during covert meetings with his co-conspirators at locations outside the NY Bank. *See* Compl. ¶¶ 15-20. In addition, Buryakov and his co-conspirators routinely met and discussed their efforts to collect and to take information from unsuspecting sources of intelligence in the United States. Among other things, Buryakov's co-conspirators specifically discussed Buryakov's past efforts to hide his true job – being a spy for the Russian Federation – from some of his supervisors at a branch of VEB outside of Russia and the United States. *See* Compl. ¶¶ 49-53.

Given the substance and nature of these allegations, Buryakov cannot credibly claim that he was unaware that he might be held criminally responsible for his misconduct. *See Maynard* v. *Cartwright*, 486 U.S. 356, 361 (1988) ("Objections to vagueness under the Due Process Clause

rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.").

## III.       BURYAKOV IS NOT ENTITLED TO A BILL OF PARTICULARS

The defendant's final claim is that the Government should be required to provide a bill of particulars in order to clarify certain factual allegations in the Indictment and the Complaint. For the reasons set forth below, the Government respectfully submits that Buryakov's motion should be denied because a bill of particulars is not necessary for him to prepare his defense or to avoid prejudicial surprise at trial.

### A.       Additional Facts Relevant to the Defendant's Request for a Bill of Particulars

The defendant seeks a bill of particulars containing additional information relating to five topics, *see* Def. Mem. at 22-23:

- The approximately four dozen meetings between Buryakov and Sporyshev conducted for the purpose of exchanging information relating to their work as spies, *see* Ind. ¶ 7(a), as well as "any other meetings . . . in furtherance of the conspiracy" (Defense requests 1 and 2);

- Any "coded" information "passed by Mr. Buryakov to anyone" (Defense request 3);

- The dates, destinations and purposes of any travel in furtherance of the charged conspiracy, *see* Ind. ¶ 7(b) (Defense request 4);

- The "economic intelligence" collected by the co-conspirators, "other than the items referred to in the Complaint" (Defense request 5); and

- The Government's position as to whether "VEB was a 'private business'" for the purported purpose of assessing the application of the Sponsored Official Exemption (Defense request 6).[10]

_____

[10] Defense request 6 seeks the Government's view on a legal question. While the request does not seek Rule 16 material, this memorandum addresses the request by outlining the Government's views as to the status of VEB and the application of the Sponsored Official Exemption in this case.

The following information already has been disclosed about the subjects and allegations

identified by the defendant:

- *The meetings involving Buryakov and Sporyshev*: The Complaint describes the nature, purpose and circumstances of numerous meetings involving Buryakov and Sporyshev regarding their work as spies, Compl. ¶¶ 15-21. The discovery includes video surveillance footage – taken from cameras located in and around Buryakov's home in the Bronx and his office in Manhattan – of many of these meetings as well audio recordings of certain of these meetings that were surreptitiously recorded by the FBI.

    Notably, along with the initial discovery production upon defense counsel's entry into this case, the Government provided to the defendant a letter cataloguing approximately 30 of these meetings (the "Meeting Letter," attached as Exhibit G). Specifically, the Meeting Letter identified the particular date, time and location of 30 meetings involving the defendant and Sporyshev, and indicated on which specific video recording each meeting could be found. *See* Govt. Ex. G at 1-2. The Government provided the Meeting Letter for the purpose of assisting Buryakov and his counsel in reviewing the discovery.

- *Coded information passed by Buryakov to others*: In the Complaint, the Government identified the circumstances whereby Buryakov would exchange coded information by phone with his co-defendant, including the use of codes such as "ticket," "book," "list," "umbrella," "the schoolbooks," and "hat" to signal his desire to meet with his handler or when referring to the exchange of sensitive documents.  *See* Compl. ¶¶ 17-21, 74.

- *Buryakov's travel*: The Indictment and Complaint outlined in detail Buryakov's travel to a foreign country for the purpose of gathering intelligence in or about November 2012. *See* Compl. ¶¶ 54-65. The discovery in this case includes travel records and voluminous email correspondence (in English) relating to this particular trip, and the steps taken by Buryakov following the trip.

- *Economic intelligence gathered by the co-conspirators*: As acknowledged by Buryakov in his memorandum, *see* Def. Mem. at 23, the Complaint outlines in detail certain documents and information gathered by Buryakov and his co-conspirators for the purpose of accumulating economic intelligence and transmitting it back to Moscow. *See* Compl. ¶¶ 12-13, 32-34, 37-43, 45-47, 54-65, 66-74. The discovery includes several recorded conversations involving Buryakov and his co-conspirators concerning this information as well as copies of the specific documents referenced in the Complaint, including the documents Buryakov took from a confidential source bearing the label "Internal Treasury Use Only." Compl. ¶ 72.

    Given the information already provided to Buryakov in the detailed Complaint, the

Indictment, the discovery, and additional disclosures not required by the discovery rules –

namely, the Meeting Letter – the defendant's request for additional information in a bill of particulars should be denied in its entirety.

### B.      Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits the Court to direct the Government to file a bill of particulars.  A bill of particulars is not a general investigatory tool for the defense.  *See United States* v. *Salazar*, 485 F.2d 1272, 1277 78 (2d Cir. 1973).  Nor is it a device to compel disclosure of the Government's evidence or its legal theory prior to trial. *United States* v. *Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974).  Rather, the sole purpose of a bill of particulars is to furnish facts that are necessary to apprise a defendant of the charges against him with sufficient precision to (i) enable him to prepare his defense, (ii) avoid unfair surprise at trial, and (iii) preclude a second prosecution for the same offense.  *See Wong Tai* v. *United States*, 273 U.S. 77, 80 82 (1927); *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1991).  Indeed, "a bill of particulars should be required only where the charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *Torres*, 901 F.2d at 234; *accord United States* v. *Chen*, 378 F.3d 151, 163 (2d Cir. 2004).  Furthermore, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (affirming denial of request for a bill of particulars where the Government adequately informed the defendant of the nature of the charges against him through discovery).  Ultimately, "[i]n deciding a motion for a bill of particulars, [t]he important question is whether the information sought is necessary, not whether it is helpful." *United States* v. *Triana-Mateus*, 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002).

The law is equally clear about what a bill of particulars is not. "Acquisition of evidentiary detail is not the function of the bill of particulars." *Torres*, 901 F.2d at 234.; *see United States* v. *Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974); *United States* v. *Lebron*, 222 F.2d 531, 535-36 (2d Cir. 1955). Nor is it a general investigative tool for the defense. *Salazar*, 485 F.2d at 1278. Further, a bill of particulars is not to be used as a vehicle to "compel the disclosure of how much the Government can prove and how much it cannot nor to foreclose the Government from using proof it may develop as the trial approaches." *United States* v. *Malinsky*, 19 F.R.D. 426, 428 (S.D.N.Y. 1956). Nor is it a vehicle for forcing the Government to disclose its legal theory. *See United States* v. *Shoher*, 555 F. Supp. 346, 349-51 (S.D.N.Y. 1983); *United States* v. *Coped*, 378 F. Supp. 99, 103 (S.D.N.Y. 1974).

Furthermore, where, as here, the defendant is charged with participating in a criminal conspiracy, the Government is not required to every such detail regarding the conspiracy.  As the Second Circuit has stated, "[t]he Government need not, when charging conspiracy, set out with precision each and every act committed by the conspirators in the furtherance of the conspiracy." *United States* v. *Cohen*, 518 F.2d 727, 733 (2d Cir. 1975) (citing *Wong Tai*, 273 U.S. at 81). As a result, defendants in conspiracy cases "are not entitled to a bill of particulars setting forth the 'whens,' 'wheres,' and 'with whoms' regarding the . . . conspiracy."  *United States* v. *Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y. 1996).

C.    **Discussion**

The defendant's request for a bill of particulars is unwarranted in this case. The 26-page Complaint is exceptionally detailed, and is full of specific factual descriptions of the criminal activity allegedly committed by Buryakov and his co-conspirators. Further, there is no question that the 8-page Indictment "track[s] the language" of the applicable statutes, "state[s] the time"

that the defendant was engaged in the charged offenses, and states the places of those offenses "in approximate terms." *See United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975). That is to say, the Indictment sets forth a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c).  Nothing more is warranted, especially given the voluminous discovery provided in this case. *See, e.g., United States* v. *Patterson*, No. 02 Cr. 283 (WHP), 2002 WL 31890950, at *10 (S.D.N.Y. Dec. 27, 2002) (denying motion for bill of particulars when charges in the indictment were straightforward, and, with discovery, indictment provided sufficient notice to advise defendants of charges against them, enabled them to prepare for trial, avoided unfair prejudice, and precluded second prosecution for same offense).

As outlined above, each of the defendant's requests for additional information has already been the subject of detailed and extensive disclosures via the Complaint, the discovery, and the Meeting Letter. Therefore, anything beyond the voluminous and detailed disclosures already made to Buryakov – such as in response to Buryakov's request for "the specific actions the Government will rely upon to prove that Mr. Buryakov was an agent of the SVR," Def. Mem. at 23 – would necessarily represent the "whens," "wheres," and "with whoms" that fall beyond the scope of the Government's obligations. *See Muyet*, 945 F. Supp. at 599.  Providing such detailed information well in advance of trial is especially problematic, where, as here, the defendant was involved in a criminal enterprise involving highly trained intelligence agents working at the direction of a foreign government. *See United States* v. *Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002) ("The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are present.  Accordingly, the government is not required to turn over information that will permit a defendant to preview a

27

government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented.").

Therefore, viewed in light of the totality of the information available to the defendant, a bill of particulars is both unwarranted and unnecessary.  *See United States* v. *Bortnovsky*, 820 F.2d 572, 573 (2d Cir. 1987) (bill of particulars is not required where information necessary to "enabl[e] defendant to prepare for trial and "to prevent surprise" is provided either "in the indictment or in some acceptable alternative form."); *United States* v. *Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003) (no bill of particulars is warranted where "the Indictment, discovery, and other information provided by the government adequately notify Defendants of the charges against them").

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motions should be denied in their entirety.

Dated: New York, New York
        July 6, 2015

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____

Adam Fee / Ian McGinley / Anna M. Skotko
Assistant United States Attorneys
Tel.: (212) 637-2200