UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - v. -                              S1 15 Cr. 73 (RMB)

EVGENY BURYAKOV,
 a/k/a "Zhenya,"

           Defendant.


# THE GOVERNMENT'S OPPOSITION TO
# DEFENDANT'S MOTIONS IN LIMINE AND THE GOVERNMENT'S MOTION TO
# PRECLUDE EXPERT TESTIMONY AND FOR ADDITIONAL DISCOVERY


PREET BHARARA
United States Attorney for the
Southern District of New York

Emil J. Bove III
Brendan F. Quigley
Stephen J. Ritchin
Assistant United States Attorneys
    *Of Counsel*

## Table of Contents

BACKGROUND ................................................................................................ 1

I. UCE-1 Compromises Sporyshev and Podobnyy and Penetrates SVR Workspaces with
Electronic Surveillance ................................................................................... 2

A. Sporyshev and Podobnyy Discuss the Arrest of the "Illegals" ......................... 4

B. Podobnyy's Statements Regarding the Defendant's SVR Service in South Africa.......... 4

C. The Defendant's Proposal to the SVR's Active Measures Directorate........................ 6

D. Sporyshev's Tasking to the Defendant Regarding the New York Stock Exchange ......... 7

II. UCE-2 Compromises Buryakov ..................................................................... 8

DISCUSSION ............................................................................................... 10

I. The Court Should Admit the April 11 Statement ................................................ 10

A. The Statement Is Admissible as a Co-Conspirator Statement ........................... 10

B. The Statement Is Admissible as a Declaration Against Interest ....................... 18

C. The Statement Is Admissible Under the Residual Exception............................ 22

II. The Court Should Not Limit the Proposed Expert Testimony About the SVR .................. 25

A. Applicable Law .................................................................................... 26

B. Discussion ......................................................................................... 29

C. Specific Topics That the Defendant Claims Should Be Excluded................................ 31

III. The Defendant Should Be Precluded from Offering Testimony from Experts Because He
Has Not Given the Required Notice ..................................................................... 38

A. Defendant's Expert Disclosure ................................................................ 38

B. Discussion ......................................................................................... 39

IV. The Defendant Should Be Ordered to Provide Additional Rule 16 Discovery.................. 41

## Table of Authorities

**Cases**

*Amorgianos* v. *AMTRAK*, 303 F.3d 256 (2d Cir. 2002). ............................................ 28

*Bernstein* v. *Bernstein Litowitz Berger & Grossmann LLP*, - - - F.3d - - - -, No. 15-0374-CV, 2016 WL 730732 (2d Cir. Feb. 24, 2016)................................................................ 11

*Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ................................... 28

*Old Chief* v. *United States*, 519 U.S. 172 (1997)................................................... 29

*United States* v. *Al Moayad*, 545 F.3d 139 (2d Cir. 2008) ...................................... 38

*United States* v. *Amuso,* 21 F.3d 1251 (2d Cir.1994) .................................... 29, 35, 37

*United States* v. *Aref*, 285 F. App'x 784 (2d Cir. 2008).......................................... 37

*United States* v. *Ashburn*, No. 11 Cr. 303 (NGG), 2015 WL 588704 (E.D.N.Y. Feb. 11, 2015) ................................................................................................................................ 29

*United States* v. *Blackmon,* 839 F.2d 900 (2d Cir.1988) ......................................... 13

*United States* v. *Bryce*, 208 F.3d 346 (2d Cir. 1999)...................................... 23, 24, 25

*United States* v. *Cabrera*, 222 F.3d 590 (9th Cir. 2000) ........................................ 38

*United States* v. *Casamento*, 887 F.2d 1141 (2d Cir. 1989) .................................... 20

*United States* v. *Coonan*, 938 F.2d 1553 (2d Cir. 1991) ........................................ 28

*United States* v. *Coppola*, 671 F.3d 220 (2d Cir. 2012) ......................................... 12

*United States* v. *Cornett*, 195 F.3d 776 (5th Cir. 1999)......................................... 17

*United States* v. *Daly*, 842 F.2d 1380 (2d Cir. 1988) ................................... 28, 32, 35

*United States* v. *Dames*, No. 04 Cr. 1247 (PAC), 2007 WL 1129323 (S.D.N.Y. Apr. 12, 2007) ................................................................................................................................ 21

ii

*United States* v. *Desena*, 260 F.3d 150 (2d Cir. 2001) .................................................... 12, 16, 18

*United States* v. *Diaz*, 176 F.3d 52 (2d Cir. 1999)......................................................... 13, 25

*United States* v. *DiDomenico*, 985 F.2d 1159 (2d Cir. 1993)........................................ 27

*United States* v. *Duvall*, 272 F.3d 825 (7th Cir. 2001) ................................................ 41

*United States* v. *Farhane*, 634 F.3d 127 (2d Cir. 2011) .............................................. 29, 37

*United States* v. *Ferguson*, No. 3:06 CR 137 (CFD), 2007 WL 4539646, (D. Conn. Dec. 14, 2007) ............................................................................................................... 41, 42

*United States* v. *Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ............................................. 28

*United States* v. *Guerrero*, 279 F. App'x 29 (2d Cir. 2008)........................................ 16

*United States* v. *Gupta*, 747 F.3d 111 (2d Cir. 2014) .................................................. 19

*United States* v. *Jefferson*, 215 F.3d 820 (8th Cir. 2000) ............................................ 12

*United States* v. *Kassir*, No. S2 04 Cr. 356 (JFK), 2009 WL 910767 (S.D.N.Y. Apr. 2, 2009) ................................................................................................................. 27, 28

*United States* v. *Katsougrakis*, 715 F.2d 769 (2d Cir. 1983)....................................... 19

*United States* v. *Lieberman*, 637 F.2d 95 (2d Cir. 1980)............................................. 18

*United States* v. *Locascio*, 6 F.3d 924 (2d Cir. 1993).................................................. 28, 29, 32, 37

*United States* v. *Losada*, 674 F.2d 167 (2d Cir. 1982) ................................................ 20

*United States* v. *Mahaffy*, No. 05 CR 613 (ILG), 2007 WL 1213738 (E.D.N.Y. April 24, 2007) ................................................................................................................. 41, 42

*United States* v. *Matera*, 489 F.3d 115 (2d Cir. 2007) ................................................ 29, 37

*United States* v. *Matthews*, 20 F.3d 538 (2d Cir. 1994)............................................... 21, 22

*United States* v. *Monk*, 577 F. App'x 8 (2d Cir. 2014) .................................................. 14

*United States* v. *Morgan*, 385 F.3d 196 (2d Cir. 2004) ........................................ 24, 26

*United States* v. *Mulder*, 273 F.3d 91 (2d Cir. 2001) ................................................ 12

*United States* v. *Mustafa*, 406 F. App'x 526 (2d Cir. 2011) ...................................... 37

*United States* v. *Onumonu*, 967 F.2d 782 (2d Cir. 1992) ........................................... 28

*United States v. Paone,* 782 F.2d 386 (2d Cir. 1986) ............................................... 13

*United States* v. *Paracha*, 313 F. App'x 347 (2d Cir. 2008) ...................................... 37

*United States* v. *Paracha*, No. 03 CR. 1197 (SHS), 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006)

.................................................................................................................................... 36

*United States* v. *Pardo-Bolland*, 384 F.2d 316 (2d Cir. 1965) .................................... 13

*United States* v. *Persico*, 645 F.3d 85 (2d Cir. 2011) ........................................... 20, 21

*United States* v. *Rastelli*, 870 F.2d 822 (2d Cir. 1989) ............................................. 13

*United States* v. *Reyes,* No.11 Cr. 1 (MRK), 2012 WL 3727995 (D. Conn. May 1, 2012) ......... 25

*United States* v. *Ruggiero,* 726 F.2d 913 (2d Cir. 1984) ............................................ 13

*United States* v. *Sabir*, No. S4 05 Cr. 673 (LAP), 2007 WL 1373184 (S.D.N.Y. May 10, 2007)

.................................................................................................................................... 36

*United States* v. *Saget*, 377 F.3d 223 (2d Cir. 2004) ....................................... 20, 21, 22

*United States* v. *Salerno*, 868 F.2d 524 (2d Cir. 1989) .............................................. 13

*United States* v. *Scott*, No. 14 Cr. 81, 2015 WL 1525580 (D. Conn. Apr. 2, 2015) .................... 25

*United States* v. *Simmons*, 923 F.2d 934 (2d Cir. 1991) .............................................. 13

*United States* v. *SKW Metals & Alloys, Inc.*, 195 F.3d 83 (2d Cir. 1999) ........................ 13, 16

iv

*United States* v. *Stratton*, 779 F.2d 820 (2d Cir. 1985) .......................................................... 21, 22

*United States* v. *Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988)................................................... 12, 16

*United States* v. *Urbanik*, 801 F.2d 629 (4th Cir. 1986)................................................................ 17

*United States* v. *Wexler*, 522 F.3d 194 (2d Cir. 2008)................................................................... 19

*United States* v. *Williams*, 506 F.3d 151, 155 (2d Cir. 2007)................................................. 19, 20

*United States* v. *Wilson*, No. 04 Cr. 1016 (NGG), 2006 WL 3694550 (E.D.N.Y. Dec. 13, 2006)

......................................................................................................................................................... 42

## Federal Statutes

18 U.S.C. §§ 793, 794.................................................................................................................... 22

28 U.S.C § 1783 ............................................................................................................................. 20

## Federal Rules

Federal Rule of Criminal Procedure 16 ............................................................................. 40, 42, 43

Federal Rule of Criminal Procedure 17 ...................................................................................... 20

Federal Rule of Evidence 401....................................................................................................... 28

Federal Rule of Evidence 702....................................................................................................... 27

Federal Rule of Evidence 801................................................................................................. 11, 12

Federal Rule of Evidence 804....................................................................................................... 19

Federal Rule of Evidence 805....................................................................................................... 12

Federal Rule of Evidence 807................................................................................................. 23, 25

**Other Authorities**

Christian Caryl, *From Russia with Indifference*, Newsweek, Feb. 20, 2001................................ 23

*Sergei Lebedev (politician)*, https://en.wikipedia.org/wiki/Sergey_Lebedev_(politician) ........... 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - v. -                                      S1 15 Cr. 73 (RMB)

EVGENY BURYAKOV,
  a/k/a "Zhenya,"

         Defendant.

## THE GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S MOTIONS IN LIMINE AND THE GOVERNMENT'S MOTION TO
## PRECLUDE EXPERT TESTIMONY AND FOR ADDITIONAL DISCOVERY

The Government respectfully submits this memorandum in opposition to the defendant's motions *in limine*, and in support of the Government's motions to preclude expert testimony and to compel discovery.

## BACKGROUND

The Government will establish at trial that the Evgeny Buryakov, a/k/a "Zhenya," the defendant, acted in the United States as an agent of the Russian Federation and a Russian foreign intelligence agency—the SVR—while operating under the "non-official cover" of employment at the New York office of Vnesheconombank ("VEB").  Buryakov participated in SVR information- and intelligence-gathering activities with at least two SVR officers:  Igor Sporyshev and Victor Podobnyy.  Before they left the country, Sporyshev and Podobnyy operated under "official cover" of employment by the Russian Federation as, respectively, a trade official and a diplomat.[1]

---

[1] Specifically, between approximately November 2010 and November 2014, Sporyshev officially served in the Trade Representation of the Russian Federation in New York.  Between

**I.  UCE-1 Compromises Sporyshev and Podobnyy and Penetrates SVR Workspaces with Electronic Surveillance**

In approximately April 2012, Sporyshev approached an FBI employee acting in an undercover capacity ("UCE-1") at a trade conference regarding the oil and gas industry in New York City.  UCE-1 purported to be an analyst from a New York-based energy company. Sporyshev provided UCE-1 with a business card indicating that he was a "Trade Representative of the Russian Federation" but directed UCE-1 to contact him via a second phone number not listed on his business card.

Following this introduction, for approximately the next two years, Sporyshev met UCE-1 at various locations in New York City.  During these meetings, they typically discussed the oil and gas industry and other economic and political issues, and Sporyshev asked UCE-1 for specific information relating to the field of UCE-1's purported employment.  On several occasions, Sporyshev gave UCE-1 either cash or gifts in return for information that UCE-1 provided.

Beginning in approximately early 2013, in response to Sporyshev's taskings, UCE-1 began to bring binders to his meetings with Sporyshev.  The binders contained purported industry analysis written by UCE-1 in response to Sporyshev's requests, supporting documentation relating to UCE-1's reports, and covertly placed recording devices.

UCE-1 told Sporyshev that the materials in the binders were sensitive and confidential, such that UCE-1 would be fired if anyone learned of his disclosures, and therefore UCE-1

---

approximately December 2012 and September 2013, Podobnyy officially served as an attaché to the Permanent Mission of the Russian Federation to the United Nations.

needed Sporyshev to return the binders to him promptly after reviewing their contents. Sporyshev complied with this request, repeatedly.  Through the use of this technique, the FBI obtained hours of audio recordings containing statements of Sporyshev, Victor Podobnyy, and other Russian intelligence personnel between approximately January 2013 and approximately May 2013.  (*See* Complaint ¶ 22, *United States* v. *Buryakov, et al.*, 15 Mag. 215 (Dkt. No. 1) (the "Complaint")).  The recordings obtained by UCE-1 make clear that Sporyshev and Podobnyy, as well as others, were operating as SVR officers by receiving taskings from Moscow, gathering responsive information, and sending it back to SVR headquarters.

In January 2013, for example, Sporyshev discussed his SVR employment contract with an associate and referred to their work as intelligence officers.  (*Id.* ¶ 23).  In April 2013, Podobnyy clarified to an associate that Sporyshev's official-cover position was "New York Office of the Trade Mission of the Russian Federation."  (*Id.* ¶ 24).  On the same day, Sporyshev and Podobnyy lamented that their work for the SVR was not as exciting as they had envisioned. (*See id.* ¶ 25).  Podobnyy said he thought that the work "would be just slightly more down to earth than in the movies about James Bond," and that he would at least be operating under a false identity.  Sporyshev agreed, noting that he expected that he would travel abroad under a "different passport."  (*See id.*).

**A.   Sporyshev and Podobnyy Discuss the Arrest of the "Illegals"**

Several weeks later, Sporyshev and Podobnyy were recorded discussing the July 2010 arrests in the United States of 10 SVR agents, referred to as "Illegals," from Directorate S.  (*Id.* ¶ 27).  The conversation included the following exchange, in substance and in part:[2]

| Podobnyy | No, first of all, there is the Directorate S.  The only fucking intelligence that I think is real intelligence is the Directorate S. |
|---|---|
| Sporyshev | It was. |

*       *       *

| Podobnyy | Look, in the States, even S-guys didn't do shit.  10 people was caught.  Do you remember what they were charged with, damn?  With illegal cashing, which the Center sent.  That's all!  Then Putin made excuses that they had no fucking task to operate, that they were some kind of sleeper cells there, just in case there is a military situation.  They didn't do a fucking shit, you know! |

**B.   Podobnyy's Statements Regarding the Defendant's SVR Service in South Africa**

On the day after Sporyshev and Podobnyy spoke about the Illegals, they were again recorded, discussing, among other things, the potential extension of Sporyshev's tour of duty in the United States.  *See* Ex. A at 7-8.  Sporyshev noted the importance of "exclud[ing] his exposure" and also noted that "Shrek"—apparently an SVR officer—had "agreed to meet my boss," which appears to be a reference to Sporyshev's boss from the Trade Mission.  In response to Podobnyy's question of whether the "boss" was "the one who has never seen before," Sporyshev replied "Yes.  Can you imagine?  I'm fucking speechless."  *Id.* at 8.

---

[2] All translations of recorded conversations contained herein and/or attached as exhibits are draft translations subject to future revision.  They have been produced to the defense on the condition that they will not be used to cross-examine any witness.

Later that afternoon, Sporyshev and Podobnyy resumed discussing the visit by Sporyshev's "boss" from the Trade Mission, with Podobnyy asking if the boss would be coming to the SVR's office—known as the "Residentura."[3]   The conversation included the following exchange, in substance and in part:

| Sporyshev | . . . OK, tomorrow I'll come by in the morning, if everything is OK and then I will leave and come back. |
| Podobnyy | You say in the morning? |
| Sporyshev | Well, if I arrange it with my boss now... I will bring him here at 9 am. [Unintelligible ["U/I"]] |
| Podobnyy | OK. Straight to the Residentura, you mean? |
| Sporyshev | Are you fucking nuts? |
| Podobnyy | But where? |
| Sporyshev | Well, there is a room here. |
| Podobnyy | Some special one? He told you to bring him here? |
| Sporyshev | Yes. |

*Id.* at 23.  Podobnyy then told Sporyshev about a similar situation that the defendant ("Zhenya") faced while working for the SVR in South Africa ("RSA") under cover of employment at VEB. Buryakov was in South Africa under non-official cover between approximately 2004 and 2009. (*See, e.g.*, June 11, 2015 Decl. of Scott Hershman, Ex. C at 11 (Dkt. No. 46)).  Specifically, Podobnyy advised that a high-level SVR officer ("Sharay") had visited South Africa and, during

---

[3] The Government anticipates introducing expert testimony at trial that the SVR's office in given location is referred to as the "Residentura."

a dinner conversation where the defendant was present, notified the defendant's boss at VEB about the defendant's SVR affiliation:

| | |
|---|---|
| Podobnyy | Zhenya told me that there was a time when Sharay, I think, came to [U/I] RSA, to the Representation. But he was not the number one person [U/I].  He definitely had a boss in RSA.  Because he told me that Sharay came to visit him, Zhenya.  And at that time even his boss did not know and it was kind of like he was closed from the boss then, he did not know that Zhenya was an employee of the Service.  And it was like: "is the boss here?  Take him to the restaurant, if you want."  Three of them including Sharay were at a restaurant.  And he told, damn, presented Zhenya in his new capacity.  Zhenya: I still don't know myself fully why the fuck he did it, evidently, in order to avoid interagency friction, he told me this himself.[4] |
| Sporyshev | Oh.  I have a very positive opinion of Sharay. |
| Podobnyy | Yes, damn it, everyone has a positive opinion of him. They say they even worship him comparing to what's now. They just say he was with Lebedev. Lebedev left and Sharay was forced to leave [U/I]. That is why he… He had nothing to lose with such background, he could easily go into business, he was not afraid for his ass, he started doing business. [U/I] As a result, damn it. |
| Sporyshev | Moreover, Sharay ... I got to know Sharay when he was the head of this BTS [PH] department. |
| Podobnyy | Uh huh |
| Sporyshev | No, not BTS.  He was the head of that very department that I joined later. |

## C.  The Defendant's Proposal to the SVR's Active Measures Directorate

Sporyshev and others also discussed Buryakov during certain of the recordings, including information and analysis provided by Buryakov in response to SVR taskings.  For example, in

---

[4] Podobnyy's statement, which is the subject of a defense motion *in limine*, is referred to herein as the "April 11 Statement."

November 2012, Buryakov used his non-official cover position at VEB to gain access to a Russia-related conference in Canada that was organized by the Canada Eurasia Business Association ("CERBA"). The CERBA conference was attended by personnel from Bombardier. Following the conference, Buryakov drafted a proposal indicating that Bombardier was considering business projects in Russia. In March 2013, a CERBA employee sent the defendant links to articles from February 2013 regarding a deal to sell aircraft to a Russian firm. In early May 2013, the defendant conducted searches of the Internet relating to Bombardier and labor unions. Later that month, Sporyshev and Podobnyy discussed a "proposal" from the defendant ("Zhenya") for "MS"—the Active Measures Directorate of the SVR responsible for implementing proactive steps designed to influence political and economic events—regarding Bombardier manufacturing planes in Russia. (Complaint ¶ 60 & n.2). Consistent with the defendant's Internet research, Sporyshev noted that Canadian labor unions were resisting the plan. (*Id.*). Sporyshev and Podobnyy discussed whether it was appropriate for the SVR office in New York, as opposed to one in Canada, to send such a proposal to Moscow. (*Id.*). Sporyshev defended the strategy, noting that the defendant had traveled to Canada under the cover of a business trip and participated in confidential discussions while there. (*Id.*).

### D.   Sporyshev's Tasking to the Defendant Regarding the New York Stock Exchange

On May 21, 2013, Sporyshev called the defendant, greeted him and then described a tasking from "top sources" relating to three questions that ITAR-TASS, a Russian news agency, could put to the New York Stock Exchange. (Complaint ¶ 39). Sporyshev called the defendant back approximately 20 minutes later. (*Id.* ¶ 40). During the call, Buryakov proposed questions regarding (i) Exchange Traded Funds (ETFs), including the "mechanisms of their use to

7

destabilize the market"; (ii) "curbing of trading robot activities"; and (iii) "technical parameters" and "other regulations directly related to the exchange." (*Id.* ¶ 40). On July 8, 2013, a purported "Bureau Chief" for ITAR-TASS sent an email to an employee of the New York Stock Exchange that parroted the questions that Buryakov proposed to Sporyshev:

> Dear friends, on behalf of the Russian news agency ITAR-TASS I would like to ask three questions:

> 1/ The mechanism of destabilization for the ETF market in modern conditions /during the crisis and to present/. How many mechanisms ETF negatively affect the game on the exchange? As brokers evaluate their impact on the economy of the country.

> 2/ Existing restrictions on the activities of trading robots. The regulation and supervision of their activities. Is there limited use of trading robots in the current conditions in terms of impact on the U.S. economy?

> 3/ The potential interest of the exchanges for financial products tied to Russia or affecting them /Depository Receipts, indexes, ETF/?

## II.  UCE-2 Compromises Buryakov

In approximately July 2014, a third party introduced Buryakov to another FBI employee working in an undercover capacity ("UCE-2"), who purported to be a working on a casino development project in Russia.  On July 22, 2014, Sporyshev expressed concern to Buryakov that dealing with UCE-2 may be a "trap," but authorized Buryakov to meet UCE-2 so that he could make a better assessment.  (Complaint ¶ 68).  Buryakov subsequently met with UCE-2 and another individual acting at the direction of the FBI (the "CS") on a number of occasions, including at VEB.  While they discussed the purported development project at these meetings,

Buryakov also asked UCE-2 and the CS for information.  During a meeting in Atlantic City, New Jersey on August 8, 2014, Buryakov, UCE-2, and the CS discussed the potential impact on the project of United States financial sanctions against Russia.  (*Id.* ¶ 72).  Buryakov was then shown a document from the United States Department of the Treasury, which bore a legend stating "Internal Treasury Use Only," and contained information regarding Russian individuals subject to sanctions.  Buryakov stated that he was interested in further similar information from the Treasury Department and took a copy of the document.

On August 28, 2014, Buryakov met with UCE-2 and the CS at VEB to further discuss the purported development project.  (*Id.* ¶ 73).  During this meeting Buryakov was provided with another document from the Treasury Department, which listed Russian banks in order of their size and bore a legend stating "UNCLASSIFIED//FOUO."[5]  Buryakov was told that the Treasury Department was using the document in connection with its deliberations regarding additional sanctions and took a copy of the document.  Following the meeting, Buryakov called Sporyshev and arranged to meet with him.  That evening, Buryakov departed VEB carrying a briefcase and went to Sporyshev's home, where he stayed for approximately 40 minutes and then left with the briefcase.  (*Id.* ¶ 74).

On September 18, 2014, Buryakov met again with UCE-2 and the CS at VEB.  During this meeting, Buryakov was provided with a presentation from the Treasury Department regarding VEB, which he kept.  Buryakov expressed interest in obtaining more information about sanctions and indicated that such information would be useful even if it related to entities

---

[5] The acronym "FOUO" means "For Official Use Only."

outside the financial sector.  Buryakov also asked for information about a proposed piece of legislation pending in the Senate and, in particular, whether the bill was likely to be enacted.

## DISCUSSION

### I.  The Court Should Admit the April 11 Statement

The defendant argues that the April 11 Statement, in which Podobnyy told Sporyshev about the defendant being identified as a "member of the Service," should be excluded because it is not "in furtherance" of the conspiracy.[6]  The Court should reject this argument.  The April 11 Statement is admissible under multiple exceptions to the hearsay rule, including the co-conspirator exception, the declaration against interest exception, and, in the alternative, the residual exception.

### A.  The Statement Is Admissible as a Co-Conspirator Statement

#### 1.  Applicable Law

Under Federal Rule of Evidence 801(d)(2) "statement[s] . . . made by [a] party's coconspirator during and in furtherance of the conspiracy" are not considered hearsay.  Fed. R. Evid. 801(d)(2)(E).  To admit a statement under Rule 801(d)(2)(E), the district court must find by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the

---

[6] The defendant filed this portion of his motions *in limine* under seal.  The reasons for this are unclear, as the motion does not contain any personal or other information that would typically justify sealing and overcome the presumption in favor of public access to judicial documents.  *See Bernstein* v. *Bernstein Litowitz Berger & Grossmann LLP*, - - - F.3d - - - -, No. 15-0374-CV, 2016 WL 730732, at *1 (2d Cir. Feb. 24, 2016) (affirming district court's decision that complaint be unsealed, despite both parties' objections, and citing, inter alia, "the presumption of public access [to judicial documents] under the First Amendment and the common law.").

statement was made during the course of and in furtherance of the conspiracy." *United States* v. *Coppola*, 671 F.3d 220, 246 (2d Cir. 2012).[7]

The requirement that the statement be "in furtherance" of the conspiracy is not unduly restrictive.  It permits introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States* v. *Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).  A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *United States* v. *Thai*, 29 F.3d 785, 813 (2d Cir. 1994); *see, e.g.*, *United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) ("[S]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." (internal quotations omitted)).

Accordingly, the Second Circuit has repeatedly affirmed the admission of co-conspirator statements regarding past events. *See, e.g.*, *United States* v. *Mulder*, 273 F.3d 91, 103 (2d Cir. 2001) (narrative of past events furthered conspiracy by keeping co-conspirator "apprised of the delicate arrangements for extort[ion]"); *United States* v. *Desena*, 260 F.3d 150, 158 (2d Cir. 2001) (statements to club members ridiculing defendant about his inexpert attempt to commit

---

[7] The defendant asserts arguments only as to the "in furtherance" requirement, and neither requirement (a) nor (b).  Further, while the Statement also contains Buryakov's statement to Podobnyy, "hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.  Here, the defendant's statements are admissible as a statement of a party opponent, under Federal Rule of Evidence 801(d)(2)(A).

arson years earlier were admissible because they "could be understood as informing other coconspirators about the status of the conflict between the two gangs, and perhaps as an exhortation to avoid ridicule by doing things right"); *United States* v. *SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88-89 (2d Cir. 1999) (written notes about past events intended "to act as a record and as a guide to future conduct"); *United States* v. *Diaz*, 176 F.3d 52, 85 (2d Cir. 1999) (narrative of past events attempted to apprise co-conspirator "of the progress or status of the conspiracy, to facilitate and encourage his assistance, and to foster the cohesiveness of the conspiracy"); *Thai*, 29 F.3d at 813-14 (narrative description of past event intended to give co-conspirators "confidence in [declarant's] ability to carry out" future criminal conduct); *United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991) (narrative of past events may have "promoted cohesiveness" and "induce[d] . . . assistance" and thus statements were properly admitted); *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) (statements about what happened to money furthered multiple current purposes of the conspiracy, including informing others "of the identity and activities of his co-conspirators"); *see also United States* v. *Salerno*, 868 F.2d 524, 535-37 (2d Cir. 1989); *United States* v. *Blackmon,* 839 F.2d 900, 912-13 (2d Cir.1988); *United States v. Ruggiero,* 726 F.2d 913, 924 (2d Cir. 1984); *United States* v. *Pardo-Bolland*, 384 F.2d 316 (2d Cir. 1965).[8]

---

[8] Thus, the defendant is plainly incorrect to assert that only a "few types of retrospective statements may be in furtherance of a conspiracy."  Def.'s Mem. at 5.

12

### 2.  The April 11 Statement Was in Furtherance of the Conspiracy

The April 11 Statement was "in furtherance of the conspiracy."[9]

As alleged in Count One, the defendant conspired with Sporyshev and Podobnyy to act in the United States as an agent of the Russian Federation.  (S1 Indictment ¶¶ 1-2).  As discussed above, in addition to their work with the SVR, all three co-conspirators worked at "cover" jobs—Sporyshev as a Trade Representative, Podobnyy at the Russian Mission, and Buryakov at VEB.

To state the obvious, for Sporyshev to effectively operate as an intelligence officer, it was critical that he maintain his cover.  (*See* Complaint ¶ 15).  If Sporyshev were discovered to be an SVR officer, the results, including increased surveillance, could hamper his ability to meet with sources and perform other tasks associated with his work for the SVR.  In addition, Sporyshev could face arrest and/or expulsion from the United States.

During a portion of the conversation between Podobnyy and Sporyshev recorded earlier in the afternoon of April 11, Sporyshev discussed the possibility of an extension of his tour of duty in New York.  Highlighting the importance of maintaining his cover, Sporyshev notes that

---

[9] Defendant also argues that the evidence is "speculative" because, to find that Podobnyy was referring the defendant, the jury would have to draw a number of inferences, such as that "Zhenya" meant the defendant, that Sharay meant an SVR official, and that "'the Service' meant the SVR.'"  Def.'s Mem. at 2-3.  This objection, however, goes to the weight of the evidence, not its admissibility.  *See, e.g.*, *United States* v. *Monk*, 577 F. App'x 8, 9-11 (2d Cir. 2014) (explaining that, because jury could draw reasonable inferences from evidence that would be probative on the issue of defendant's guilt, defendant's objections went to "weight, not admissibility").  The Government submits that there will be overwhelming evidence at trial that the defendant used the nickname "Zhenya," including recorded conversations between the defendant and Sporyshev.  The defendant also concedes that he worked in South Africa before coming to the United States.  Def.'s Mem. at 2-3 & n.1.  Moreover, the conversation makes clear that the defendant had a role in South Africa that was unknown to his boss ("even his boss did not know").  As such, what the defendant calls "speculative" are, in fact, reasonable inferences for the jury to draw from the evidence.

13

"in order to exclude my exposure, everything has to be processed through UP now."  Ex. A at 7.
To facilitate Sporyshev's extension, "Shrek" "has agreed to meet [Sporyshev's] boss after two
and half years of living [here]."  *Id.* at 8.   Sporyshev indicates that, although his Trade
Representative boss may have some suspicion that Sporyshev is acting as a SVR officer ("he
kind of knows"), Sporyshev is nonetheless surprised and concerned about the potential meeting
between Shrek and Sporyshev's boss.  *Id.* ("Can you imagine? I'm fucking speechless.").  *Id.*

Podobnyy later asks if Sporyshev is bringing his boss to the SVR Offices ("Straight to the
Residentura, you mean?").  *Id.* at 23.   Sporyshev, cognizant of the need to maintain operational
secrecy, even with respect to other Russians, responds "Are you fucking nuts?" and indicates
that, rather than bringing his Trade Representative boss into the SVR offices, he will bring him
to another room.  *Id.*  Podobnyy then makes the April 11 Statement, regarding the interaction
involving the defendant, his VEB "boss," and Sharay in South Africa.  *Id.* at 24.

Viewed in this light, the April 11 Statement is a statement in furtherance of the
conspiracy.   In describing Zhenya's experience in South Africa, Podobnyy was not merely
relating a past event.   Instead, he was warning Sporyshev—who had earlier stated he was "Can
you imagine?" and "I'm fucking speechless" about the planned meeting between "Shrek," who
appears to be an SVR official, and his Trade Representative boss—that he was right to be
concerned.   Based on Zhenya's experience in South Africa, and despite Sporyshev's attempts to
keep his official and SVR roles separate for two and a half years, the likely outcome of the
meeting would be that Sporyshev could be fully outed as an SVR officer to his "boss" at the
Trade Representation.   As such, Podobnny's statement was more a warning about a *future* event

14

that could affect Sporyshev and the charged conspiracy, than simply a "narrative" of a past event.   The purpose of the statement was to assist Sporyshev with respect to the meeting involving his SVR supervisor and his "boss" by relating the defendant's account of his prior experience in a similar circumstance.  Clearly, such a statement "reasonably [can] be interpreted as encouraging a co-conspirator"  to act in such a way as  "to advance the conspiracy," *Tarantino*, 846 F.2d at 1412, "as a guide to future conduct," *SKW Metals & Alloys, Inc.*, 195 F.3d at 88-89, and a warning about future events that could impact the conspiracy, *see United States* v. *Guerrero*, 279 F. App'x 29, 31 (2d Cir. 2008) ("[C]ontrary to Guerrero's protestations, the statement was made in furtherance of the conspiracy-it was made as a warning to Bisono that the drugs they purchased from Guerrero and were about to sell to a purported customer were of poor quality and might jeopardize their future relationship.").

        The cases relied on by the defendant are distinguishable.  Indeed, the differences between these cases and the circumstances of the April 11 Statement further show that the April 11 Statement was "in furtherance of the conspiracy."   The statements found to be "idle chatter" or "mere narrative" about past events in *United States* v. *DeSena*, *United States* v. *Cornett*, and *United States* v. *Urbanik* all took place in social settings and in the context of larger conversations of topics other than the conspiracy at issue.  In *DeSena*, for example, the Second Circuit excluded a statement overheard by a cooperating witness—while in a bar—in which the declarant, a leader of the Pagans motorcycle club, made fun of the defendant by describing the defendant's role in a botched arson.  *DeSena*, 260 F.3d at 157-58.  In *Cornett*, the Fifth Circuit excluded a statement that the declarant had made to a cooperating witness in a bowling alley, in

15

which the declarant, the ex-girlfriend of the leader of a drug trafficking organization, purportedly identified the defendant as one of the leader's new girlfriends and a member of drug conspiracy. *United States* v. *Cornett*, 195 F.3d 776, 783 (5th Cir. 1999).  As the Fifth Circuit observed, the statement took place during conversation largely involving "diverse issues as the bowling prowess of certain friends and relatives, the appearance of some of the patrons at the bowling alley, the merits of certain designer outfits and the respective talents of certain exotic dancers," as well as the problems between the declarant and her ex-boyfriend.  *Cornett*, 195 F.3d at 783-85.  In *Urbanik*, the statement-at-issue occurred while the declarant and a cooperating witness were working out and having a "casual conversation about weightlifting."  The declarant stated that his friend—identified as the defendant—was small in size but "could bench press 300 pounds" and, also happened to be the declarant's "connection in Florida for pot."  *United States* v. *Urbanik*, 801 F.2d 629, 695 (4th Cir. 1986) (explaining that, according to the cooperator's own testimony, drug "business had . . . been concluded before the weight-lifting discussions," and the cooperator and declarant were "'hanging out' and 'shooting the breeze'").

Here, by contrast, the April 11 Statement decidedly did not take place in a social setting or in the context of a larger conversation where the participants were "shooting the breeze."  To the contrary, as evidenced by the fact that Podobnyy interpreted Sporyshev's mention of "here" to mean "the Residentura," *see* Ex. A at 23, the statement occurred inside the SVR's offices in New York.  And the larger conversation involved Sporyshev, Podobnyy, and other associates discussing the status of SVR taskings and operations and identifying SVR associates responsible for those taskings by name.  *See, e.g*, Ex. A at 2-4, 9-10, 11 (discussion of "coded telegram"),

15-16, 18, 21, 27-28.  Notably, in *DeSena*, while excluding the statement made in the bar, the Second Circuit found that a substantively identical statement that was made at a later meeting of the Pagans motorcycle club was in fact, "in furtherance of the conspiracy."  *DeSena*, 260 F.3d at 158 (explaining that, in the context of the club meeting, the statement about the defendant's role in the botched arson "could be understood as informing other coconspirator about the status of the conflict between the two gangs and perhaps as an exhortation to avoid ridicule by doing things right").[10]

\*\*\*

Here, Podobnyy's statement to Sporyshev served "some current purpose in the conspiracy," *Thai*, 29 F.3d at 813, confirming Sporyshev's concerns that his cover would likely be compromised if his boss from the Trade Representative met with an SVR official the following day. As such, the April 11 Statement is admissible as a statement in "furtherance of the conspiracy" and should be admitted into evidence.

---

[10] *United States* v. *Lieberman*, 637 F.2d 95 (2d Cir. 1980) also relied on by the defendants, is also distinguishable.   In finding the statement-at-issue was not "in furtherance of the conspiracy," the Second Circuit noted it was "entirely retrospective" and, could not have been intended to foster secrecy among the co-conspirators, since it was made in the presence of other employees who were not involved in the drug conspiracy at issue.  637 F.2d at 102-03.  Here by contrast, although describing a past event, the April 11 Statement was not "entirely retrospective" because it related to the upcoming meeting between Sporyshev's "boss" and the SVR official.  Further, unlike the statement in *Lieberman*, the statement was made in a secure setting, where Sporyshev, Podobnyy, and others felt free to discuss at great length the SVR's activities in New York and elsewhere.  Moreover, the *Lieberman* court found the statement-at-issue to be admissible as a declaration against interest.  *Id.* at 103 ("We conclude, however, that the statements were admissible against Lieberman under an exception to the hearsay rule, as statements against [the declarant's] penal interest.").

17

**B.   The Statement Is Admissible as a Declaration Against Interest**

In addition, the April 11 Statement is admissible as a declaration against interest.

**1.   Applicable Law**

Under Federal Rule of Evidence 804(b)(3), a statement by an unavailable declarant is admissible if "a reasonable person in the declarant's position would have made [it] only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability" and was "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3); *see also United States* v. *Gupta*, 747 F.3d 111, 129-31 (2d Cir. 2014).

To satisfy Rule 804(b)(3), the proponent of the statement must show by only a preponderance of the evidence: "'(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement."' *United States* v. *Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (quoting *United States* v. *Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983)) (alteration in original).[11]

---

[11] Because statements to associates about crimes in which the declarant participated are not testimonial, the admission of such statements does not violate the Confrontation Clause. *Williams*, 506 F.3d at 157.

### 2.   The Requirements of Rule 804(b)(3) Are Met Here

All three requirements of Rule 804(b)(3) are met here.

*First*, Podobnyy is unavailable.  He left the United States in or about September 2013 and is believed to be located in Russia.  Because Podobnyy is outside the United States and is not a United States "national or resident," he is beyond the Court's subpoena power, and the Government cannot compel his attendance at trial.  *See* Fed. R. Crim. P. 17(e); 28 U.S.C § 1783.  Further, there is no extradition treaty between the United States and Russia and, thus, any attempt to extradite Podobnyy would be futile.  *United States* v. *Casamento*, 887 F.2d 1141, 1169-70 (2d Cir. 1989) (holding that witness who was in Italy was "unavailable" and rejecting argument that Government "should have made a formal written request for [the witness's] extradition" because "such a request would most likely have been futile and [t]he law does not require the doing of a futile act"); *United States* v. *Losada*, 674 F.2d 167, 172 n.1 (2d Cir. 1982) ("[I]n the absence of an extradition treaty with the country in which the unavailable witness was located, the witness' unavailability was sufficiently established.").

*Second*, the April 11 Statement is sufficiently self-inculpatory to warrant an inference that "a reasonable person in [Podobnyy's] shoes would perceive the statement[s] as detrimental to his [] own penal interest."  *United States* v. *Saget*, 377 F.3d 223, 231 (2d Cir. 2004).  "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context."  *United States* v. *Williams*, 506 F.3d 151 (2d Cir. 2007).  "A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant."  *United States* v. *Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted).  "The Second Circuit has held

19

that such statements that simultaneously inculpate the declarant and the defendant are admissible when made to an 'ally,' rather than a stranger or law enforcement official, and where there is no reason to suspect that the 'inculpatory portion is any less trustworthy than the part of the statement that directly incriminates the declarant.'"  *United States* v. *Dames*, No. 04 Cr. 1247 (PAC), 2007 WL 1129323, at *4 (S.D.N.Y. Apr. 12, 2007) (quoting *United States* v. *Matthews*, 20 F.3d 538, 546 (2d Cir. 1994)); *see also Saget*, 377 F.3d at 230 ("[A] statement incriminating both the declarant and the defendant may possess adequate reliability if . . . the statement was made to a person whom the declarant believes is an ally, and the circumstances indicate that those portions of the statement that inculpate the defendant are no less reliable than the self-inculpatory parts of the statement.").

Here, in the Statement, Podobnyy acknowledges his relationship with the defendant and admits his knowledge that "Zhenya was an employee of the Service," i.e., the SVR.  Ex. A at 24. As such, the Statement "clearly tie[s Podobnyy] to the illegal scheme"[12] in this case by providing evidence of his knowing participation in the conspiracy in which the defendant was working as an agent of the Russian Federation and, more specifically, the SVR.  *See United States* v. *Perisco*, 645 F.3d at 102-03 (holding that statements were against declarant's penal interest because, among other things, "while those statements would not have been sufficient, standing alone, to convict [declarant] of any crime, they would have been probative in a criminal trial against [declarant] to show his membership in the Colombo Crime Family").  As a Russian intelligence officer in the SVR's "Residentura" in New York describing the defendant's

---

[12] *United States* v. *Stratton*, 779 F.2d 820, 829, (2d Cir. 1985) (holding that statements were against declarant's penal interest where they "clearly tied him to the illegal scheme").

intelligence work to Sporyshev, another intelligence officer, Podobnyy's statement also exposed him to potential liability for crimes of espionage, *see* 18 U.S.C. §§ 793, 794.

*Third*, Podobnyy's Statement is sufficiently trustworthy so as to be admissible under Rule 804(d)(3). Podobnyy was speaking to Sporyshev, whom the recordings will demonstrate was a close SVR colleague and ally, inside a secure SVR space. As evidenced by the balance of the April 11 Statement, Podobnyy, Sporyshev, and other colleagues felt secure enough to discuss on-going operations, as well as their "cover" jobs. *Saget*, 377 F.3d at 230 ("[A] statement incriminating both the declarant and the defendant may possess adequate reliability if . . . the statement was made to a person whom the declarant believes is an ally, and the circumstances indicate that those portions of the statement that inculpate the defendant are no less reliable than the self-inculpatory parts of the statement."); *Matthews*, 20 F.3d at 546 (finding "trustworthiness condition" met where "[t]he statements were not made to law enforcement authorities, were not made in response to questioning, and were not made in a coercive atmosphere. Rather, they were volunteered by [the declarant] to his girlfriend, an intimate and confidante, in the private recesses of their home. There were no coercive pressures, and there was no attempt to curry favor with authorities. Indeed, when he made the statement to [his girlfriend], [the declarant] had no reason to expect that his admission would ever be disclosed to the authorities"); *Stratton*, 779 F.2d at 829 (trustworthiness condition met where declarant believed he was speaking to co-conspirators,

not authorities, in recorded conversations).  Further, the defendant used the name "Zhenya," and did, in fact, work at VEB in South Africa.[13]

As such, the April 11 Statement meets all three requirements for a declaration against interest, and the Court should allow its admission into evidence on that basis as well.

### C.  The Statement Is Admissible Under the Residual Exception

The April 11 Statement is also admissible under the residual or catch-all exception to the hearsay rule in Federal Rule of Evidence 807.

### 1.  Applicable Law

A statement "not specifically covered" by a hearsay exception is nevertheless admissible pursuant to Rule 807, "under the following circumstances":

(1) the statement has equivalent circumstantial guarantees of trustworthiness [as compared to other hearsay exceptions];

(2) [the statement] is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807; *see also United States* v. *Bryce*, 208 F.3d 346, 350-51 (2d Cir. 1999).

---

[13] In addition, Podobnyy indicates "Sharay" was "Zhenya's" SVR superior and goes on to say that Sharay and "Lebedev" enjoyed a close professional relationship ("They just say [Sharay] was with Lebedev. Lebdev left and Sharay as forced to leave.").  Sergei Lebedev was the head of the SVR in the early 2000s.  *See* Christian Caryl, *From Russia with Indifference*, Newsweek, Feb. 20, 2001 ("Last December, Russian television treated its viewers to a first: an interview with none other than Lt. Gen. Sergei Lebedev, head of the country's Foreign Intelligence Service (known by its Russian initials as the SVR."); *Sergei Lebedev (politician)*, https://en.wikipedia.org/wiki/Sergey_Lebedev_(politician) (describing Lebedev as "Director of Russian's Foreign Intelligence Service (SVR) from 2000 to 2007.").

In *Bryce*, the Second Circuit affirmed the admission of a wiretap call under Rule 807. The call was between one of the defendant's drug customers ("Johnson") and a third party involved in narcotics trafficking ("Gomez").  *See* 208 F.3d at 349.  During the call, Johnson advised Gomez that the defendant had narcotics for sale.  The Court cited "[s]everal factors" that were "particularly relevant" in explaining why the call had sufficient guarantees of trustworthiness and advanced the interests of justice, such that its admission was appropriate under Rule 807:

> (i) the statements were obtained via a covert wiretap of which neither Johnson nor Gomez was aware; (ii) the statements were made during the same time period that Johnson was conversing with [the defendant]; (iii) Johnson's statements implicated both himself and [the defendant] as participants in a narcotics conspiracy; and (iv) Gomez was Johnson's colleague in the narcotics trade.

*Id.* at 351; *accord United States* v. *Morgan*, 385 F.3d 196, 208 (2d Cir. 2004) (upholding the admission under Rule 807 of a letter from the co-defendant to her boyfriend, explaining that it was "trustworthy" because it "was not in response to police questioning"; "[i]t was not written in a coercive atmosphere"; "[i]t was not addressed to law enforcement authorities"; and the co-defendant "had no reason to expect that it would ever find its way into the hands of the police" and "did not write it to curry favor with them or with anyone else").

### 2.  Discussion

Here, the April 11 Statement meets the requirements of Rule 807.

First, the April 11 Statement clearly bears on material facts.  It shows that the defendant worked for the SVR as an "employee of the Service" while in South Africa, a fact that was hidden ("closed") from his "boss" at VEB.   These facts are all the more significant here, given Buryakov's apparent defense that his only job in New York was "as the deputy representative of

23

the New York office of VEB, an agency of the Russian Federation that promotes investments and trade with Russia, a job that was fully disclosed to the U.S. government, and which involved Mr. Buryakov collecting and exchanging information relating to legal commercial transactions." Parties Proposed Joint Voir Dire ¶ 1.  Simply put, Buryakov's prior employment with "the Service" in South Africa, in addition to his job at VEB, makes significantly less plausible the defendant's argument that his interactions with SVR officers in New York were benign and related solely to his work at VEB.[14]

Second, the April 11 Statement is the most probative direct evidence of Buryakov's membership in the SVR.  The Government is aware of no other evidence in which a co-conspirator explicitly identifies Buryakov as a "member of the Service."

Finally, the April 11 Statement had the requisite "guarantees of trustworthiness" and its admission would "advance the interests of justice."  Fed. R. Evid. 807; *see Bryce*, 208 F.3d at 351 (explaining that the "interests of justice" analysis "is linked to an evaluation of trustworthiness").  Indeed, the April 11 Statement is squarely on all fours with the Second

---

[14] Such evidence meets the test of "relevance" under Rule 401.  Courts in this Circuit routinely admit evidence of a defendant's membership in criminal (or other) organizations as direct proof of the charged offenses. *See, e.g.*, *United States* v. *Scott*, No. 14 Cr. 81, 2015 WL 1525580, at *3 (D. Conn. Apr. 2, 2015) ("[T]he Court agrees that evidence of defendant's gang affiliation is relevant under Rule 401 in light of the government's proffer."); *see United States* v. *Reyes,* No. 11 Cr. 1 (MRK), 2012 WL 3727995, at *1 (D. Conn. May 1, 2012) (finding evidence of gang affiliation relevant to demonstrate existence of a joint venture or conspiracy); *Diaz*, 176 F.3d at 79 ("[I]t is within the [trial] court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.").

Circuit's holding in *Bryce* that the statements had sufficient indicia of trustworthiness to satisfy Rule 807: (1) "the statements were obtained via a covert [electronic surveillance] of which neither [Podobnyy] nor [Sporyshev] was aware;" (2) "the statements were made during the same time period that [Sporyshev and Podobnyy were] conversing with [Buryakov];" (3) "[Podobnyy's] statements implicated both himself and [Buryakov] as participants in a . . . conspiracy;" and (4) the parties to the April 11 Statement, Podobnyy and Sporyshev, were "colleague[s]" and close confidantes in conducting intelligence operations in the U.S. on behalf of the SVR.  *Bryce*, 208 F.3d at 351; *see also, e.g.*, *Morgan*, 385 F.3d at 208 (upholding admission of letter from defendant's co-conspirator pursuant to Rule 807).  As such, the Court should admit the April 11 Statement pursuant to Rule 807.

***

Thus, as set forth above, Podobnyy's April 11 Statement to Sporyshev is admissible because it meets the requirements for multiple exceptions to the hearsay rule.

## II.  The Court Should Not Limit the Proposed Expert Testimony About the SVR

The Government notified the defense on January 19 that it intends to present at trial expert testimony regarding the history, practices, policies and priorities of the SVR, and on February 29 provided the defense with a written summary of that testimony and the other expert testimony the Government expects to present.  (*See* Letter from AUSAs Emil J. Bove, Brendan F. Quigley, and Stephen J Ritchin to White & Case LLP (Feb. 29, 2016) (attached hereto as Ex. B).  Defendant has moved to limit the proposed expert testimony with respect to the SVR.  (Def. Mem. at 12-18).  According to the defendant, portions of that testimony are irrelevant or should be barred under Federal Rule of Evidence 403.  The defendant's motion is based on the premise

that "[h]aving superseded the Indictment to remove any reference to the SVR (an alleged Russian government intelligence agency)—presumably because the Government did not want the burden of proving beyond a reasonable doubt that Defendant is an SVR agent—evidence about the broader purpose and work of the SVR is not relevant and will only mislead or prejudice the jury." (Def. Mem. at 13).  And, "[s]imply put, having chosen not to prove which agency of the Russian Federation allegedly had Mr. Buryakov under its direction or control, the Government should not be allowed to inflame the jury by portraying this case as about a new Cold War between the United States and Russia, or protecting the United States from Russian spies." (*Id.*).

## A.  Applicable Law

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, the Court "must determine whether an expert's opinion on the subject will 'assist the trier of fact,' or, in other words, be helpful to the jury." *United States* v. *Kassir*, No. S2 04 Cr. 356 (JFK), 2009 WL 910767, at *3 (S.D.N.Y. Apr. 2, 2009) (quoting *United States* v. *DiDomenico*, 985 F.2d 1159, 1163 (2d Cir. 1993)), *aff'd sub nom. United States* v.

26

*Mustafa*, 406 F. App'x 526, 528-29 (2d Cir. 2011). The Court must make a "'common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'" *Kassir*, 2009 WL 910767, at *3 (quoting *United States* v. *Locascio*, 6 F.3d 924, 936 (2d Cir. 1993)); *see also United States* v. *Onumonu*, 967 F.2d 782, 788 (2d Cir. 1992).  In addition, the court has a "gatekeeping" function with respect to expert testimony—it is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert* v. *Merrell Dow Pharms.*, *Inc.*, 509 U.S. 579, 597 (1993); *Amorgianos* v. *AMTRAK*, 303 F.3d 256, 265 (2d Cir. 2002).

Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Relevant evidence in a criminal case is not limited to evidence that directly establishes the elements of the offense charged.  As the Second Circuit has explained,

> the trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.

*United States* v. *Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988); *accord United States* v. *Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997); *United States* v. *Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). And as Judge Garaufis of the Eastern District of New York noted just last year:

27

As the Supreme Court explained in *Old Chief v. United States*, 519 U.S. 172 (1997), the prosecution—the party with the burden of proof—has a "need for evidentiary richness and narrative integrity in presenting a case." *Id.* at 183. "Thus, the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." *Id.* at 188.

*United States* v. *Ashburn*, No. 11 Cr. 303 (NGG), 2015 WL 588704, at *10 (E.D.N.Y. Feb. 11, 2015).

In particular, expert testimony about the structure and operations of organizations whose conduct is at issue in criminal cases has repeatedly been found to be both relevant and not unfairly prejudicial. *See United States* v. *Farhane*, 634 F.3d 127, 159 (2d Cir. 2011) ("We have approved the use of expert testimony to provide juries with background on criminal organizations . . . .") (citation omitted). The Court of Appeals has, for example, approved the admission of expert testimony "'to help explain the operation, structure, membership, and terminology of organized crime families.'" *United States* v. *Matera*, 489 F.3d 115, 121-22 (2d Cir. 2007) (quoting *Locascio*, 6 F.3d at 936; citing *United States* v. *Amuso*, 21 F.3d 1251, 1263–64 (2d Cir.1994); *United States v. Tutino*, 883 F.2d 1125, 1134 (2d Cir. 1989). As the Court of Appeals explained:

[d]espite the prevalence of organized crime stories in the news and popular media, these topics remain proper subjects for expert testimony. Aside from the probability that the depiction of organized crime in movies and television is misleading, the fact remains that the operational methods of organized crime families are still beyond the knowledge of the average citizen.

*Amuso*, 21 F.3d at 1264.

The Second Circuit has held that this "rationale applies with equal force to terrorist organizations, including al Qaeda." *Farhane*, 634 F.3d at 159. The same is true of foreign

28

intelligence organizations.  They too are the subject of many stories in the news and popular media, which depict them in ways that are misleading.  The James Bond movies, for example, come immediately to mind.  Indeed, Sporyshev complained during a recording obtained by UCE-1 that he thought SVR work would be more like a Bond film.  And the operational methods of foreign intelligence organizations, as this trial will make clear, are also beyond the knowledge of the average citizen.

**B.  Discussion**

The defendant's argument proceeds from the false premise that the Government has "chosen not to prove which agency of the Russian Federation allegedly had Mr. Buryakov under its direction or control . . . ."  (Def. Mem. 13).  The Government has made no such choice.  To the contrary, the Government intends to prove that the defendant agreed to operate subject to the direction or control of SVR officers, his co-conspirators Sporyshev and Podobnyy.

The defendant's argument also proceeds from false statements, or false assumptions, about the evidence in this case.  The defendant claims, for example, that "[n]one of the surveillance materials produced by the Government make any mention of U.S.-Russia relations or any broader reasons why Mr. Sporyshev requested information from Mr. Buryakov."  (Def. Mem. 14).  There are many examples in the surveillance materials of discussion of U.S.-Russia relations.  To take just one, at one point in their conversations Podobnyy told Sporyshev "the fact that Moscow is so scared is bullshit, but from time to time Americans are highly tempted because we are so weak now that they want to pressure us down and squash us."  Similarly, the defendant claims that testimony about how the SVR is organized to collect different forms of intelligence does not have "anything to do with . . . any actual evidence in this case."  (Def.

29

Mem. 16).   That is wrong.   As noted Sporyshev and Podobnyy discussed in recorded conversations various parts of the SVR, including Directorate S and "MS," or "Active Measures."   Expert testimony will establish that these are parts of the SVR and explain their functions.

The defendant's position is also inconsistent.   He seeks to preclude only some of the proposed expert testimony regarding the SVR, thereby acknowledging that the SVR and testimony about it are both relevant to this case and not unfairly prejudicial.   He explicitly excludes from his motion proposed testimony "that SVR headquarters is in Moscow and called the Moscow Center;" "that SVR offices are called 'residenturas' and that New York City has one;" "that assignments come from SVR headquarters and are communicated through residenturas;" and "that certain terms are used by SVR officers and have certain meanings, including 'IO,' 'clean,' 'open,' 'legend,' 'cover,' 'impulse post' or 'post impulse' and 'White House.'"   The defendant acknowledges that testimony on these topics concerns "references that may appear in taped conversations that may be offered at trial."   *Id.*

The same is true of all, or virtually all, of the Government's proposed expert testimony about the SVR.   Thus by the defendant's own logic, this testimony should not be precluded.

Moreover, the defendant's position is simply wrong.   The Government intends to prove that Buryakov participated in a conspiracy with SVR officers Sporyshev and Podobnyy to act as an unregistered agent of the Russian Federation.   In order to understand that conspiracy, the jury must have a working knowledge of what the SVR is, and how it operates.   For example, to sustain its burden on Count One, the Government must prove, among other things, that two or

more individuals agreed to have Buryakov act as an unregistered agent of Russia.  Expert testimony about the SVR's history, its mission and priorities in the United States and New York, and its methods of operation, including how it brings SVR officers into the United States, is central to that element of Count One, and without it the jury will be confused.

### C.  Specific Topics That the Defendant Claims Should Be Excluded

The defendant claims that the Court should preclude expert testimony about how the SVR is organized to collect different forms of intelligence, arguing that none of the forms of intelligence "have anything to do with the charges in the Superseding Indictment or any actual evidence in this case."  (Def. Mem. 16, first bullet point).  The defendant is wrong.  The Government expects to prove that Buryakov and his co-conspirators tried to, and did, collect intelligence while in the United States, including economic intelligence, which is the kind of intelligence sought by Line ER.  Moreover, as noted above, there are multiple references to different parts of the SVR by Sporyshev and Podobnyy on recorded conversations.  Those references will mean little to the jury without expert testimony.  Moreover, with such testimony, these references will help make clear that Sporyshev and Podbnyy are SVR officers, and help to establish the existence of the conspiracy that the Government must prove to prove the crime charged in Count One.  *See, e.g.*, *Locascio*, 6 F.3d at 937 (approving admission of expert testimony about the structure and operations of organized crime families); *Daly*, 842 F.2d at 1388 ("[S]ubjects held to be appropriate for expert testimony have included explanations of organized crime structure such as the relative positions of 'capo,' 'captain,' and 'crew[.]'") (citations omitted).

31

The defendant's argument to preclude expert testimony that the SVR will sometimes pay for information (Def. Mem. at 16, fifth bullet point), should be rejected for similar reasons. The Government expects to present evidence that, for example, Sporyshev paid UCE-1 for information on several occasions. Expert testimony that the SVR will sometimes pay for information will help establish that Sporyshev was not an unusually generous trade representative, but an SVR officer following SVR tradecraft. That, in turn, will help establish the existence and methods of operation of the conspiracy charged in Count One.

For similar reasons the Court should also reject the defendant's attempt to preclude expert testimony that "[i]n New York, the SVR generally focuses on gathering intelligence related to financial and business matters, including the oil, gas and renewable energy industries in light of the importance of oil and gas to Russia . . . ." and that "[t]he SVR gatherS information from both public and non-public sources . . . ." (Ex. B at 2 (tenth and eleventh bullet points); Def. Mem. at 16 (fourth bullet point).[15]  The evidence will show that this is precisely the kind of information on which Sporyshev and Podobnyy focused, and that Buryakov gathered this kind of information for them.

The defense also seeks to preclude expert testimony that SVR officers entered the United States, among other ways, as "'Illegals' who generally adopt false identities" and that "[t]en 'illegals' were arrested in the United States in 2010 for conspiring to act as unregistered agents of the Russian Federation and to launder money." (Ex. B at 2 (sixth and seventh bullet points);

---

[15] The defendant conflates and, in doing so, distorts to some degree these proffers of expert testimony. *Compare* Ex. B at 2 (tenth and eleventh bullet points on the page) *with* Def. Mem. at 16 (fourth bullet point on the page). The Government has quoted separately the portions of the proffers that the defendant attacks.

Def. Mem. at 16 (third bullet point)).  This application too should be rejected.  During the recorded conversations between Sporyshev and Podobnyy, they discussed the "Illegals" who were arrested in the United States in 2010, including the crimes the Illegals were charged with and that the Illegals were purportedly "sleeper cells."  *See supra* pages 4-5.

Without expert testimony about the "Illegals" generally and without expert testimony about the arrest of ten such "Illegals" in 2010 and the charges against them, the jury will not understand this and other recorded exchanges on the topic between two of the conspirators.  With such testimony, the jury will understand this exchange, and understand as well that it shows that Sporyshev and Podobnyy, who are discussing that money was sent to the "Illegals" by "the Center" (i.e., SVR headquarters), as well as what the Illegals did in the United States and whether they were able to obtain any materials, are SVR officers.  The jury will also understand that this exchange helps to establish the existence of the conspiracy charged in Count One.

The Government also expects to offer testimony that SVR officers receive training in Russia of a year or more, and among the subjects of their training are source development and recruitment, as well as tradecraft.  (Ex. B at 2, fifth bullet point).  The defendant moves to preclude this proffered testimony as well, although he does not specifically explain why he does so.  (Def. Mem. at 16, third bullet point).  The Government expects to put before the jury in this case substantial evidence related to SVR efforts to recruit and develop sources in the United States, including the testimony noted above from an undercover FBI agent, and portions of the recorded conversations between Sporyshev and Podobnyy in which they discuss recruiting and developing sources.  In addition, the Government expects to put before the jury substantial

33

evidence of the use of tradecraft by all the members of the charged conspiracy. Expert testimony that SVR officers receive substantial training in how to recruit and develop sources, and in tradecraft, is entirely appropriate background "to furnish an explanation of the understanding or intent with which certain acts were performed," *Daly*, 842 F.2d at 1388, and to explain "operational methods" that "are still beyond the knowledge of the average citizen." *Amuso*, 21 F.3d at 1264 (discussing organized crime families).

The defendant has also argued that the Court should preclude expert testimony that the SVR's intelligence-gathering priorities often reflect world events, claiming that such testimony "has nothing to do with anything relating to this case." (Def. Mem. at 15, third bullet point). The defendant is wrong. The Government expects to introduce evidence, for example, that the defendant gathered information about the effect of economic sanctions on Russia, in response to a tasking from Sporyshev. (*See* Complaint ¶¶ 45-48.) Expert testimony that the SVR's intelligence-gathering priorities reflect world events furnishes "an explanation of the understanding or intent with which certain acts were performed." *Daly*, 842 F.2d at 1388.

Similarly, expert testimony that the SVR views the United States as the chief intelligence target, or "enemy," of Russia (Ex. B at 2, eighth bullet point), which the defendant claims "has no relationship to Section 951 or any charge in the Superseding Indictment," (Def. Mem. at 15, second bullet on the page), will explain "the understanding or intent" with which most of the acts at issue in this case were performed. *Daly*, 842 F.2d at 1388. Such testimony also will explain terminology used by Podobnyy when he told Sporyshev that he was "sitting right now" at the "chief enemy spot." (Complaint ¶ 25).

34

In light of the centrality of the SVR to this case, some brief description of its history and size is entirely appropriate to orient the jurors with respect to this organization with which most of them likely are entirely unfamiliar.   Thus the Government has given notice of expert testimony that

> [w]hen the Russian Federation came into existence in 1991, there were two intelligence agencies that principally took over the functions of the KGB, which was the principal intelligence agency of the Soviet Union:  the FSB and the SVR. The function of each is, generally speaking, gathering and analyzing domestic intelligence (FSB) and foreign intelligence (SVR) for the leaders of the Russian Federation.  A separate agency, the GRU, handles military intelligence.

(Ex. B at 1, first bullet point).  The Government has also given notice of expert testimony that "[w]orldwide, the SVR employs thousands of people."   (*Id.* at 2, second bullet point).   In addition to providing the jurors with a sense of the scope and scale of the activities of the SVR, the latter topic is of particular relevance given that the Government expects to introduce evidence that Buryakov gathered intelligence in Canada and worked for the SVR in South Africa.  Further, evidence that orients the jury with respect to the basic history of an organization has commonly been introduced.  *See United States* v. *Sabir*, No. S4 05 CR. 673 (LAP), 2007 WL 1373184, at *11 (S.D.N.Y. May 10, 2007) ("[t]he Government is correct that testimony regarding the history, structure, organization, membership, and operation of al Qaeda will give the jury an important overview of al Qaeda, so that the members of the jury will have at least a working knowledge of what al Qaeda is, and therefore, will be able to place" other evidence in its proper context) (internal quotation marks and citation omitted); *United States* v. *Paracha*, No. 03 CR. 1197 (SHS), 2006 WL 12768, at *21 (S.D.N.Y. Jan. 3, 2006) *aff'd,* 313 F. App'x 347 (2d Cir. 2008) ("[t]he government may elicit expert testimony regarding al Qaeda's origin, leadership, and

35

operational structure, as such testimony will aid the jury in understanding how al Qaeda came to be and the manner in which it currently functions. This area of testimony is analogous to the type of expert testimony regularly permitted by the United States Court of Appeals for the Second Circuit in cases involving organized crime families.") (citations omitted).

Given the Government's intention to prove that Buryakov agreed to operate in the United States subject to the direction or control of SVR officers, expert testimony about the SVR's history, practices, policies and priorities will assist the trier of fact and is not unfairly prejudicial. When organizations such as al Qaeda, other terrorist groups and organized crime families have been similarly central to other cases, similar testimony about their history, practices, policies and priorities repeatedly has been permitted. *See, e.g.*, *Farhane*, 634 F.3d at 158-60 (upholding expert testimony regarding al Qaeda); *United States* v. *Mustafa*, 406 F. App'x 526, 528-29 (2d Cir. 2011) (affirming decision to allow testimony of "terrorism expert" regarding al Qaeda); *United States* v. *Aref*, 285 F. App'x 784, 792 (2d Cir. 2008) (upholding expert testimony regarding Pakistani and Kurdish terrorist groups); *United States* v. *Paracha*, 313 F. App'x 347, 351 (2d Cir. 2008) (upholding expert testimony regarding al Qaeda); *United States* v. *Matera*, 489 F.3d 115, 121-22 (2d Cir. 2007) (upholding admission of expert testimony about organized crime families); *Amuso*, 21 F.3d at 1263–64 (same); *Locascio,* 6 F.3d at 936 (same). There is no greater danger of unfair prejudice from similar testimony about the SVR, an organization that most jurors likely view as presenting far less personal danger to them than terrorist groups such

as al Qaeda or organized crime families.  The motion to limit expert testimony about the SVR

should be denied.[16]

---

[16] This case is a great distance from *United States* v. *Cabrera*, 222 F.3d 590 (9th Cir. 2000), cited by the defendant in support of his argument that the evidence about the SVR that he challenges "is only designed to portray Mr. Buryakov as a danger to the United States based either on his nationality or on hostility and fear directed at Russia itself."  (Def. Mem. at 16).  In *Cabrera*, a drug trafficking case, a Government witness "injected extraneous, prejudicial material, including impermissible references to the defendant's national origin" during his testimony.  222 F.3d at 591.  The SVR is by no means extraneous to this case; it is at the heart of it, as is Russia, in light of the fact that the Government must prove that the defendant acted "as an agent of a *foreign* government."  18 U.S.C. § 951(a) (emphasis added).  In *Old Chief* v. *United States*, 519 U.S. 172 (1997), also cited by the defense, (Def. Mem. at 18), the evidence the Court held should have been excluded on Rule 403 grounds was the nature of the predicate felony for a felon in possession of a weapon charge, evidence that served to prove only a legal status.  The Court rested its holdings on the "peculiarities of the element of felony-convict status and of admissions and the like when used to prove it . . . ,"  519 U.S. at 191, peculiarities that are not present in this case.  Nor is this case at all like *United States* v. *Al Moayad*, 545 F.3d 139 (2d Cir. 2008), also cited by the defendant.  (Def. Mem. at 18).  In *Al Moayad* the district court was found to have erred by admitting lengthy, detailed, "highly charged and emotional" testimony, 545 F.3d at 147, 160, about a "catastrophic" suicide bombing on a bus in which the witness was riding and in which the witness's cousin was killed.  *Id.* at 160.  This testimony had "minimal evidentiary value," *id.*, the defendant had offered to stipulate to the relevant fact this testimony tended to show, *id.* at 160-61, and the district court refused a proposed limiting instruction, instead proposing an "inappropriate" instruction declined by the defense, and thus "ultimately provided no guidance to the jury that might have mitigated the self-evident prejudicial effect" of the testimony.  *Id.* at 162.  The testimony of an expert about the history, practices, policies and priorities of a foreign intelligence organization is nothing like the testimony at issue in *Al Moayad*.

**III.  The Defendant Should Be Precluded from Offering Testimony from Experts Because He Has Not Given the Required Notice**

**A.   Defendant's Expert Disclosure**

On February 25, the Court set a schedule for expert disclosure for each side, including "full expert disclosures" by the Government by February 29 and "full expert disclosures" by the defense by March 2.  (Dkt. No. 122).  The Government made its disclosures on February 29.  (*See* Ex. B).

On March 2, the defendant notified the Government of four proposed defense experts: two proposed experts, who will, based on their review of discovery materials provided by the Government, "opine on Mr. Buryakov's activities as an employee of a state-owned development bank"; a professor of Russian and East European studies who will testify about a number of topics; including what communications among the co-conspirators purportedly "show about the relationship of the participants" in those communications; and a proposed expert who will provide "background information regarding" and "testimony regarding" certain topics and ultimately "provide testimony regarding the audio quality of the audio recordings produced by the Government to Defendant."  Letter from Scott Hershman to Stephen Ritchin (Mar. 2, 2016) (attached hereto as Ex. C)

While the defendant's disclosure lists topics about which these proposed experts will testify,[17] the defendant does not disclose what any of these purported experts' opinions are or the

---

[17]  *See, e.g.*, Ex. C at 2 (paragraph (I)(1)(2) and (3) ("Dr. Czinkota will provide testimony regarding" and "about" various subjects); paragraph (II)(1)(2) and (3) ("Mr. Schuster will provide background testimony regarding" and will "testify regarding" and "about" various subjects)).

38

facts or other bases underlying those opinions.  The remainder of the description of the expected

testimony of these experts is a list of the topics about which they are expected to testify rather

than what they will say.

Further, we note, with respect to the expert who is expected to offer testimony "regarding

the audio quality of the audio recordings produced by the Government," that the defendant has

failed to produce any "results or reports of any physical . . . examination and of any scientific test

or experiment," Fed. R. Crim. P. 16(b)(1)(B), production of which is required if the defendant

has possession, custody or control of the item and intends to use it in his case-in-chief at trial, or

intends to call the witness who prepared the report and the report relates to the witness's

testimony.  *Id.*

In what appears to be the defendant's recognition that he has complied with neither

Federal Rule of Criminal Procedure 16(b)(1)(C) nor this Court's order that he "make full expert

disclosures" by March 2, the defendant ends his letter by claiming that his letter is a "good faith

effort at this time" to comply with the requirements of Rule 16(b)(1)(C).  He claims, however, to

"expressly reserve the right to offer additional expert testimony in response to Jencks Act and

*Giglio* material, the proof offered by the Government, and our own continued preparation for

trial," (Ex. C at 5), despite the fact that the Court's order required "full expert disclosures" by the

day of his letter.

### B.  Discussion

Because the Government complied with its expert disclosure obligations, Rule

16(b)(1)(C) requires, with respect to defense expert witnesses, "a written summary of any

testimony that the defendant intends to use under Rules [of Evidence] 702, 703, or 705 at trial."

Fed. R. Crim. P. 16(b)(1)(C).   "This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  *Id.*

Numerous courts have held that a list of topics about which an expert is expected to testify, such as those provided by the defendant with respect to all his proposed experts, does not comply with the requirements of Rule 16.   For example, the Seventh Circuit has held, with respect to notice provided by the Government (for which Rule 16 sets out the same requirements with respect to the contents of the summary), that

> The Rule requires a summary of the expected testimony, not a list of topics. The government's notice provided a list of the general subject matters to be covered, but did not identify what opinion the expert would offer on those subjects. For example, the statement that [the witness] would testify concerning "the manner in which methamphetamine is distributed" does not in any way identify the particular opinion that [the witness] offered at trial-for example, that methamphetamine is typically divided into small packages for distribution. Similarly, the statement that [the witness] would testify "concerning amounts of methamphetamine an individual might have for distribution, as opposed to personal use," does not identify what amount, according to [the witness], would point to intended sales rather than use.

*United States* v. *Duvall*, 272 F.3d 825, 828-29 (7th Cir. 2001).

District courts in this Circuit have reached the same holding with respect to a defendant's expert notice, holding that "[m]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."  *United States* v. *Ferguson*, No. 3:06 CR 137 (CFD), 2007 WL 4539646, *1 (D. Conn. Dec. 14, 2007) (citing *Duvall*, 272 F.3d at 828); *accord United States* v. *Mahaffy*, No. 05 CR 613 (ILG), 2007 WL 1213738, *3 (E.D.N.Y. April 24, 2007) ("[t]he testimony would also be excluded because the disclosure statement only proffered general topics and did not describe any opinions that

would be offered by the witness on these topics"), *conviction vacated on other grounds,* 285 Fed. App'x 797 (2d Cir. 2008) (summary order).  Moreover, "[e]ven if the disclosure provides a sufficient summary of any opinions to be offered by the witness, it may be excluded if the defendant "has made no attempt at all to describe the bases and reasons for those opinions as required by [Rule 16(b)(1)(C) ]." *Mahaffy¸* 2007 WL 1213738, *2 (citing *United States* v. *Wilson*, No. 04 Cr. 1016 (NGG), 2006 WL 3694550, at *3 (E.D.N.Y. Dec. 13, 2006) (quotation omitted)).

The defense has met none of these requirements.  It has provided none of the opinions it expects to elicit from any of its four noticed experts, and thus none of the "bases and reasons" for any such opinions.  Accordingly, the Court should preclude testimony from these experts.  *See* Fed. R. Crim. P. 16 (d)(2)(C); *Ferguson*, 2007 WL 4539646, *1 ("If a defendant fails to provide disclosures in accordance with the Rule, the district court may exclude the expert's testimony at trial") (citing *Mahaffy*, 2007 WL 1213738, *2).

If the Court does not preclude the expert testimony, it should require very prompt compliance with its order of February 25 requiring "full expert disclosures" by the defense, in order to allow the Government time to assess whether the proposed testimony meets the relevant legal requirements and, if not, ask the Court to play its required "gatekeeping" function with respect to expert testimony without need for continuances.

## IV.   The Defendant Should Be Ordered to Provide Additional Rule 16 Discovery

Finally, the defendant argues in his motion for pretrial release filed March 7, 2016 that he "has copies of the ticket stubs, receipts and the like to prove" that "allegations of tradecraft were false."  (Def. Bail Mem. at 1-2).  The Government has complied with its obligations under

41

Rule 16(a)(1)(E) and repeatedly requested reciprocal discovery under Rule 16(b)(1)(A). The defendant has not produced any "ticket stubs, receipts, [or] the like" to date,[18] and the Government respectfully requests that he be ordered to comply with Rule 16(b)(1)(A) forthwith.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should (i) deny defendant's motion *in limine* and (ii) grant the Government's motions to preclude expert testimony and for additional discovery.

Dated: New York, New York
      March 8, 2016

                Respectfully submitted,

                PREET BHARARA
                United States Attorney for the
                Southern District of New York

By: _____
                Emil J. Bove III
                Brendan F. Quigley
                Stephen J. Ritchin
                Assistant United States Attorneys
                (212)637-2444/2190/2503

---

[18] While the defendant did make its first production of discovery on the evening of March 7, none of the 1,360 pages of documents produced appear to contain any ticket stubs or receipts.